2003 VT 4

## State of Vermont v. Walter LeClaire

[819 A.2d 719]

No. 01-411

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 24, 2003

*Robert Simpson*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Amestoy, C.J.** Defendant appeals his conviction after a jury found him guilty of murder in the second degree for causing mortal head trauma to a sixteen-month-old child left in his care. Defendant argues that he is

entitled to a new trial because the Chittenden District Court erred by: (1) denying his motion to dismiss in which he claimed that the State failed to collect and preserve potentially exculpatory evidence; (2) prohibiting him from introducing certain evidence at trial in his defense; (3) admitting as evidence the statements he made to the police while on furlough; (4) denying his request for a presentence investigation report; and (5) failing to hold an evidentiary hearing on his motion for a new trial. We affirm.

¶ 2. On March 3, 1999, a call was made from defendant's home to 911, reporting that a sixteen-month-old girl was not breathing. Within one minute and a half, a rescue team arrived. The rescue team found the child not breathing, with no heartbeat and no electrical activity. A medical expert testified at trial that this condition indicates that at least ten minutes must have elapsed from the time the child was injured to the time the rescue team arrived and was unable to detect electrical activity. A CAT scan performed at the hospital revealed that the child had endured significant trauma to her brain with enough force to cause bleeding in several areas, dramatic retinal hemorrhages, and retinal detachment. One retinal specialist testified that he had examined thousands of eyes and had never witnessed a more dramatic example of an injury consistent with a baby who had been shaken. When defendant was interviewed at the hospital that day, he told police that his dog knocked the child over and that she struck her head on a toolbox.

¶ 3. The medical testimony presented at trial directly contradicted defendant's claim that the dog pushed the child. For instance, one medical expert, who treated the child at the hospital, testified, "[T]his dramatic presentation, that is bleeding within the brain serious enough to cause a cardiac arrest, was not consistent with the stated mechanism of injury." The doctor went on to say that the child's injury instead "would be consistent with a head injury with forces seen in moderate to high speed motor vehicle accidents . . . from children who have been ejected from cars and strike their head on the ground or trees . . . ." The medical experts agreed: defendant's explanation that the child was knocked over by a dog onto the toolbox was inconsistent with the multiple injuries to the child's head and the extreme retinal bleeding found in the child's eyes.

¶ 4. In its decision denying defendant's motion for acquittal, the trial court found:

> The evidence was essentially uncontroverted that the total fatal head trauma could not be accounted for, and was plainly inconsistent with, defendant's explanation for the death of the child. The dog's push and the infant's less than two-foot fall onto the toolbox, as described and demonstrated by defendant, was

not nearly equivalent to the high speed collision, long fall or severe shaking described by the physicians as necessary to cause the combined sub-dural, sub-arachnoid and retinal bleeding. If the dog's push could have caused the torque required for the tissue-tearing hematoma, it did not appear to account for all three injuries, or for the necessary velocity and force to cause death. If the impact from the dog's push could have caused retinal bleeding, the doctors agreed that it did not account for the extraordinary degree of hemorrhaging in this case.

The court explained that most of the medical experts testified, and none disagreed, that the child's injuries were consistent only with "shaken infant" or "shaken impact" syndrome.

¶ 5. An autopsy was done on the child's body, in March 1999, at which a small blood sample was collected but not a hair sample. Also in early March 1999, police collected physical evidence from defendant's home, including the toolbox. One to two months after the autopsy and burial of the body, hairs were found on the toolbox collected from defendant's home.

¶ 6. On May 17, 1999, defendant filed a motion with the district court to preserve, test, and/or provide duplicate material to the defense. In his motion, defendant requested the State to "preserve and provide to the defendant for independent testing hair samples of the decedent" and also requested "an adequate comparison sample from [police] evidence . . . [which] contains hair." The State filed a letter, on May 26, 1999, in which it responded that hair samples were not collected from the victim but that a mitochondrial DNA analysis could be performed to test the hair sample by using an available sample of the victim's blood instead of hair. The judge ruled the motion as moot, stating that "there's nothing to preserve here" since the State did not have a hair sample from the victim. The court also pointed out at the hearing that there was "another way . . . for you to get hair samples [from the victim] if that were required as a last resort," referring to exhumation.

¶ 7. In April 2000, defendant filed a motion to dismiss in which he again argued that the State had failed "to collect and preserve such evidence as may be exculpatory in nature" and "to produce such evidence after having been requested to do so." The court held a hearing on the motion to dismiss several months later. At the hearing, a medical expert, Dr. Buell, testified that a mitochondrial DNA test could be performed on the unidentified hair from the toolbox by using a blood sample, but that the mitochondrial DNA test of hair is statistically weaker than a nucleus

genomic DNA test, especially because a mother and all of her children have the same mitochondrial DNA. Additionally, Dr. Buell testified that a microscopic exam of the unidentified hair might show whether the hair "was crushed, pulled out or broken." Following the expert's testimony, the judge observed, "I asked the last time whether there was anything in this hair to indicate that it was left there other than by pulling it out of the sky, and I still don't have an answer to that. . . . is there any evidence that the hair was there by virtue of anything other than gravity?" Defendant did not offer anything in response at that time. Subsequently, the State filed a motion in limine to exclude evidence relating to the unidentified hair on the toolbox. The court granted the motion, declaring that the evidence proffered by defendant in this regard was irrelevant. As noted, the jury returned a verdict of guilty after the trial, and this appeal followed.

## I.

¶ 8. Citing *Brady v. Maryland*, 373 U.S. 83 (1963), defendant first contends the State had an obligation to produce a sample of the victim's hair for testing once defendant requested it and that the State's failure to do so denied defendant due process of law. When the prosecution fails to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment, the prosecution violates the defendant's due process rights. *State v. Goyette*, 156 Vt. 591, 597, 594 A.2d 432, 436 (1991); see *Brady*, 373 U.S. at 87 (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."). There are three elements of a true *Brady* violation: (1) the State must have suppressed evidence; (2) that evidence must be favorable to the defendant because it is either exculpatory or impeaching; and (3) the defendant was prejudiced as a result. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

¶ 9. The purpose of the first element, suppression of evidence by the State, and *Brady* as a whole is "to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982). Therefore, where the defendant has notice of the essential facts which would allow the defendant to take advantage of any exculpatory evidence, and fails to do so, the defendant cannot then argue under *Brady* that the prosecution suppressed or failed to disclose such evidence. See *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993). Here, defendant requested a hair sample from the child victim several months after the autopsy and burial had occurred. A hair sample had not been taken during the autopsy, but

the court made it clear to defendant that he could, if necessary, have the body exhumed to obtain a comparison hair sample. Defendant never requested an exhumation order from the court as a method for retrieving a hair sample. Accordingly, he has not established that the State improperly suppressed any evidence.

¶ 10. Moreover, defendant has not established that the evidence would be favorable to him. He requested a hair sample from the child in order to prove that the unidentified human hair on the toolbox came from the child during the purported fall. Despite the court's repeated requests, however, defendant failed to show how the unidentified hair found on the toolbox, even if it was the child's hair, would have been favorable or relevant to his case. Prior to receiving her fatal injury, the child had lived in defendant's home for several weeks. The court noted that her hair could have fallen onto the toolbox at any time during this period. Defendant nevertheless declined to do a microscopic examination of the hair to look for any signs that the hair had been pulled out or broken as opposed to simply resting there as a result of the child living in the home. All of these options, a microscopic exam for trauma to the hair, exhumation, and a mitochondrial DNA test, were available to defendant in advance of his trial. Defendant has not made the requisite showing that the evidence would have been favorable to him, nor did he attempt to do so through any of these options.

¶ 11. Finally, defendant relies on our decision in *State v. Goshea*, 137 Vt. 69, 75-76, 398 A.2d 289, 293 (1979), to argue that the State had an obligation under *Brady* to produce the evidence once defendant requested it. In *Goshea*, a case in which the identity of the victim was a vigorously contested issue, we ordered a new trial when the State failed to inform the defendant during trial that a witness saw the alleged murder victim alive. 137 Vt. at 76, 398 A.2d at 294. Significantly, we determined in *Goshea* that the evidence in question was both favorable to the accused and relevant. *Id.* Defendant failed to make this essential showing in the present case. Thus, we conclude that the trial court did not err in denying defendant's motion to dismiss for a *Brady* violation.

## II.

¶ 12. Defendant next argues that his constitutional right to present a defense was violated because he was prohibited from introducing evidence at trial regarding the hair found on the toolbox, and thus he is entitled to a new trial. The State had filed a motion in limine to exclude any testimony that a hair was found on the toolbox or that the State had failed to

perform a comparative analysis of the child victim's hair and the unidentified hair. The trial court granted the State's motion on the ground that the hair and lack of a comparative analysis were not relevant under V.R.E. 401. In its decision, the court explained:

> Absent some indication that the hair reflects traumatic contact, or that the child's head reflects traumatic contact with the toolbox, or that the infant's death could have resulted from striking the box without such traumatic indication appearing, the presence of a single hair upon the toolbox is no more relevant than household dust. Absent any proffer by defendant of injury consistent with head-to-toolbox contact, the failure of the state to conduct comparative analysis of decedent's hair is no more relevant than the state's failure to perform comparative analysis of the decedent's fingerprints or dental records; all for which no apparent reason appeared at the time of investigation or appears now.

Defendant did not proffer any evidence in response to the court's inquiries regarding relevance.

¶ 13. It is well settled that trial courts have wide latitude in determining whether to admit or exclude evidence. *State v. Little*, 167 Vt. 577, 579, 705 A.2d 177, 180 (1997) (mem.); *State v. Hooper*, 151 Vt. 42, 46, 557 A.2d 880, 882 (1988) (trial judge has broad discretion in deciding questions of relevancy). While courts enjoy broad discretion in deciding evidentiary matters, this discretion is limited in criminal cases by defendant's constitutional due process rights and right to confront witnesses against him. *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996).

¶ 14. Under V.R.E. 401, relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In *State v. Hooper*, 151 Vt. at 46-47, 557 A.2d at 882, we held that the trial court acted within its discretion in determining relevancy when it excluded evidence of the presence of semen on the victim of a sexual assault after a laboratory analysis concluded that it was scientifically impossible to determine whether or not the semen was from the defendant. The Court found that the evidence was not probative of defendant's guilt or any other fact of consequence to the case, and thus the court properly excluded the evidence. *Id.* at 47, 557 A.2d at 882. Similarly, the unidentified hair in this case was not relevant without some connection or showing that it makes a material fact "more probable or less probable than it would be without the evidence." V.R.E. 401. In light of

the applicable standard of review and defendant's failure to show relevancy by linking the hair in some meaningful way to his defense, we cannot say that the trial court abused its discretion in excluding the evidence. *Little,* 167 Vt. at 579, 705 A.2d at 180 (this Court will not reverse a decision to exclude evidence absent an abuse of discretion resulting in prejudice).

## III.

¶ 15.   Defendant claims that the court should have granted his motion to suppress certain statements he made to police because he was on furlough at the time and did not receive *Miranda* warnings before making the statements. Relying on *Miranda v. Arizona,* 384 U.S. 436 (1966), and *Mathis v. United States,* 391 U.S. 1 (1968), defendant argues that, as a furloughee, he was "in custody" when officers from the Burlington Police Department questioned him at the hospital on March 3, 1999, prior to his arrest. Defendant bears the burden of proving that he was "in custody" and, therefore, entitled to *Miranda* warnings. See *Commonwealth v. Girouard,* 766 N.E.2d 873, 880 (Mass. 2002) ("[T]he defendant bears the burden to prove that he was in custody."); *State v. Howe,* 136 Vt. 53, 59, 386 A.2d 1125, 1129 (1978) (determining that appellant did not present evidence necessary to establish that he was "in custody" for *Miranda* purposes); *State v. Garbutt,* 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) ("Suspects not in custody are not entitled to *Miranda* warnings.").

¶ 16.   Custody for *Miranda* purposes has been more narrowly defined than custody in other situations, such as federal habeas corpus. *Minnesota v. Murphy,* 465 U.S. 420, 431 (1984). Thus, defendant's use of *Conway v. Cumming,* 161 Vt. 113, 116-17, 636 A.2d 735, 737 (1993), to demonstrate that a furloughed individual is "in custody" is misplaced in the present context. To determine whether an individual is in custody for *Miranda* purposes, the "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)). We must make "an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning." *State v. Willis,* 145 Vt. 459, 475, 494 A.2d 108, 117 (1985). Here, defendant adds nothing to "the totality of the circumstances" beyond his argument — not made below — that he subjectively believed he was in custody. The failure to proffer any evidence of restraint of movement or any other evidence associated with a formal arrest falls short of the defendant's burden to prove custody. As

the trial court noted, defendant "relies solely on his furlough status to argue that he was in custody." That reliance is an insufficient basis to require a *Miranda* warning. There was no error in admitting defendant's statements to the officers.

## IV.

¶ 17. Defendant next claims that the trial court erred in denying his request for a presentence investigation report (PSI). Defendant contends that because he was sentenced to a maximum term of life imprisonment without parole, the court acted unreasonably in denying his request. The argument is without merit.

¶ 18. The purpose of a PSI is "to give to the sentencing judge the fullest possible information concerning the defendant's life and characteristics" so that the judge may impose an appropriate sentence. *State v. Ramsay*, 146 Vt. 70, 78, 499 A.2d 15, 20 (1985). However, under V.R.Cr.P. 32(c)(1), "the court, in its discretion, may dispense with the report, in the following situations:

(A) if the offense is a misdemeanor;
(B) if the defendant has two or more felony convictions;
(C) if the defendant refuses to be interviewed by a probation officer or requests that disposition be made without a presentence report;
(D) if it is impractical to verify the background of the defendant."

While it may have been the better practice for the court to have ordered a PSI, defendant does not challenge the court's finding that defendant had "two or more felony convictions" and was, therefore, within the ambit of V.R.Cr.P. 32(c)(1)(B). Moreover, defendant fails to demonstrate — or even allege — how the lack of a PSI prejudiced him. Further, defendant makes no claim that he was sentenced on the basis of unreliable or insufficient information. See *State v. Patterson*, 674 A.2d 416, 422 (Conn. 1996) ("The primary risk associated with the lack of a PSI is the possibility that the sentence imposed will be based on unreliable and insufficient information."). The trial court did not abuse its discretion or otherwise commit error in refusing to order a PSI.

## V.

¶ 19. Defendant's final claim is that the court committed reversible error by failing to hold an evidentiary hearing on his motion for a new trial, which was based upon claims of inadequate representation.

Defendant conceded, however, that his motion was filed after the ten-day limit of V.R.Cr.P. 33 had expired. Thus, the court did not err in denying defendant's motion. See *State v. Grega*, 170 Vt. 573, 575, 750 A.2d 978, 981 (1999) (mem.) (holding that trial court lacked subject matter jurisdiction because "motion for a new trial based on grounds other than newly discovered evidence must be brought within ten days of the verdict").

¶ 20. A defendant claiming ineffective assistance of counsel may file a post-conviction relief action under 13 V.S.A. § 7131. Should defendant decide to pursue this matter, he may properly file for relief under this statute. Finally, due to defendant's ability to seek relief under 13 V.S.A. § 7131, we do not reach his coram nobis claim. See *In re Stewart*, 140 Vt. 351, 355 n.1, 438 A.2d 1106, 1107 n.1 (1981) (refusing to reach the defendant's coram nobis claim where defendant could file under post-conviction relief statute).

*Affirmed.*