2015 VT 7

## In re E.W., Juvenile

[114 A.3d 112]

No. 13-441

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed January 16, 2015

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Appellant.

*Sarah A. Baker*, Orleans County Deputy State's Attorney, Newport, for Appellee.

¶ 1. **Skoglund, J.** In this delinquency proceeding, E.W. appeals from an order denying his motion to suppress statements to the police allegedly made in violation of his rights under the Fifth and Sixth Amendments to the U.S. Constitution and Chapter I, Article 10 of the Vermont Constitution. For both his federal and state claims, the critical issue is whether E.W. was "in custody" while being questioned by the police at his foster home without being apprised of his *Miranda* rights. We conclude that the juvenile was in custody, and therefore reverse the trial court judgment.

¶ 2. The facts may be summarized as follows. E.W. was fifteen years old, in the custody of the Department for Children and Families (DCF), and living in a foster home when the events in question occurred. On the morning of June 7, 2013, a Vermont state trooper in uniform arrived at E.W.'s foster home to investigate a break-in and motor-vehicle theft.[2] The officer testified that his focus centered on E.W. as a suspect after receiving information that a vehicle had been stolen in Glover and learning on the way to the scene that E.W. "had run away from a foster home and that he had previously stolen a vehicle in the past."

¶ 3. After arriving at E.W.'s residence, the officer spoke with an adult male, who informed the officer that he was E.W.'s foster father. The foster father testified that E.W. had been living there about six to eight weeks at the time. He recalled that the officer explained that "he wanted to speak with E.W. in regards to some stolen property that he needed to find," that "there was a witness and that someone had seen E.W.," and that "they were looking for a car."

¶ 4. The foster father then spoke privately with E.W. and told him not to say anything to the officer until the foster father contacted DCF. When asked what he and E.W. discussed, the foster father responded, "[h]onesty," explaining that he was "trying to encourage E.W. to be honest," and how "[i]t's not always easy to do the right thing." He denied specifically directing E.W. to do the right thing, however, or telling him that he had to speak with the officer.

¶ 5. The foster father telephoned for guidance from E.W.'s guardian ad litem (GAL), who told him that "[u]sually the

---

[2] The record does not specifically disclose whether the officer was armed.

attorneys do not like the children interviewed unless they are there." The GAL then attempted to reach E.W.'s attorney, leaving a voice mail, and then spoke with the foster father again.[3] The GAL advised him to be present during any conversation between E.W. and the police officer, and the officer then took the telephone. The GAL recalled explaining to the officer that their attorneys generally do not like the children questioned "without them present." The officer responded that there was a family "without their car and that E.W. was the only one that knew where the car was because they believe he had taken it" and they "would like to be able to get these people back their car." The GAL then told the officer "to do what you gotta do" but to be sure that the foster parent was present during the interview. While the officer and the foster parent spoke with the GAL, E.W. did not.

¶ 6. The ensuing interview was not recorded, and very little testimony was adduced about its specific content or progression. The officer recalled that it lasted about an hour, started inside the house, and then moved outside to the porch and finally to a roofed vegetable stand in front of the house. No *Miranda* warnings were given. The foster father was present throughout. He recalled that the officer "asked E.W. about where the car was," informing him that the police "were aware" he had taken it to Derby "but didn't know where it had gone after that." The foster father also recalled that he twice interrupted the officer's questioning to speak privately with E.W. when it appeared that "the floodgates . . . opened" and E.W. started making admissions to offenses beyond those that the officer had described.

¶ 7. E.W. was subsequently charged with two counts of burglary, four counts of unlawful trespass in an occupied residence, three counts of petit larceny,[4] one count of unlawful mischief, and one count of operating a vehicle without owner consent. He moved to suppress his statements to the officer and dismiss all counts, asserting violations of his Fifth and Sixth Amendment rights as well as his rights under Chapter I, Article 10 of the Vermont Constitution. The trial court denied the motion, concluding that

---

[3] E.W. was represented by counsel at the time in connection with a prior pending juvenile delinquency petition.

[4] The trial court reports this as two counts of petit larceny, but we count an additional charge filed on July 8, 2013. E.W. eventually pled to three counts of petit larceny.

E.W. was not in custody at the time of the interrogation, and that *Miranda* warnings were therefore not required. E.W. then entered a conditional plea to all counts except the unlawful-mischief count, which was dismissed by the State, and reserved his right to appeal the suppression ruling.

¶ 8. On appeal, E.W. argues that his motion to suppress should have been granted under both the federal and state constitutions. As to the U.S. Constitution, E.W. argues that he should have been given *Miranda* warnings because he was in custody during his conversation with the officer. As to the Vermont Constitution, E.W. claims that he should have had the opportunity to consult with a genuinely interested adult independent from the State before being questioned, whether or not he was in custody, as required by *In re E.T.C.*, 141 Vt. 375, 377-80, 449 A.2d 937, 939-40 (1982).

¶ 9. A motion to suppress raises a mixed question of fact and law. *State v. Sullivan*, 2013 VT 71, ¶ 15, 194 Vt. 361, 80 A.3d 67. We uphold the trial court's findings of fact unless they are clearly erroneous. *State v. Mara*, 2009 VT 96A, ¶ 6, 186 Vt. 389, 987 A.2d 939. Whether the facts meet the proper standard to justify the relevant police action is a question of law, which we review de novo. *Id.*

¶ 10. ■ Under the Fifth and Sixth Amendments to the U.S. Constitution, criminal defendants have the right to receive certain warnings before being subjected to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).[5] Since it is uncontested that E.W. was interrogated, we must determine whether he was "in custody" at the time in order to determine whether he had a right to *Miranda* warnings. See *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) ("Suspects not in custody are not entitled to *Miranda* warnings."). "Defendant bears the burden of proving that he was 'in custody' and, therefore, entitled to *Miranda* warnings." *State v. LeClaire*, 2003 VT 4, ¶ 15, 175 Vt. 52, 819 A.2d 719.

¶ 11. ■ Our seminal case on juvenile rights under the Vermont Constitution, Chapter I, Article 10, is *In re E.T.C.* There, we found that a juvenile may voluntarily and intelligently waive his right against self-incrimination and his right to counsel under Article 10 only if:

---

[5] The same constitutional protections apply to a juvenile in a delinquency proceeding as to an adult defendant in a criminal prosecution. 33 V.S.A. § 5288.

(1) he [is] given the opportunity to consult with an adult; (2) that adult [is] one who is not only genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) the independent interested adult [is] informed and . . . aware of the rights guaranteed to the juvenile.

141 Vt. at 379, 449 A.2d at 940.

¶ 12. ▪ The parties treat E.W.'s *Miranda* claim as entirely distinct from his Article 10 claim. It is not so distinct. The year after deciding *E.T.C.*, we held that a juvenile's right to consult with an independent interested adult under Article 10 attaches simultaneously with the right to *Miranda* warnings — during custodial interrogation — and not before and not without custody. *State v. Piper*, 143 Vt. 468, 473, 468 A.2d 554, 557 (1983) ("[S]uch right accrues to a person under the age of eighteen years at the commencement of a custodial interrogation by the police . . . simultaneously with the right to be given *Miranda* warnings."); cf. *State v. Zumbo*, 157 Vt. 589, 591-93, 601 A.2d 986, 988 (1991) (rejecting argument by adult defendant that Article 10 requires *Miranda* warnings in circumstances other than those required by the Fifth Amendment). In *Piper*, the defendant, who was a juvenile, made exactly the same argument E.W. makes here — that the requirement of an independent interested adult should apply whenever police interrogate a juvenile whether or not the juvenile is in custody. We rejected the argument, explaining:

> Defendant would have us extend the rule to cover all situations in which minors are questioned by the police. We find this position untenable. The burden on law enforcement officials would far outweigh the benefit accruing to minors. The police would face a significant handicap if, before questioning any witness who is a minor, they had to summon an interested adult to the station or scene. The difficulty in producing such an adult could cause unwarranted and prejudicial delay in investigatory situations when time is often of the essence.

*Piper*, 143 Vt. at 473, 468 A.2d at 557.

¶ 13. ■ This holding is congruent with the determination that, for adult defendants, Article 10 is coextensive with the Fifth Amendment right against self-incrimination and very closely related to the Sixth Amendment right to counsel. *State v. Oney*, 2009 VT 116, ¶ 8 n.1, 187 Vt. 56, 989 A.2d 995. E.W.'s claim under Article 10 that *E.T.C.* was violated because the foster father was not an independent interested adult therefore also hinges on whether E.W. was "in custody" as defined under *Miranda*. As discussed below, however, the presence or absence of an independent adult may have some bearing on whether E.W. was in custody, i.e., whether a reasonable person in E.W.'s position would have felt free to terminate the interview.

¶ 14. ■ We therefore turn to the question of whether E.W.'s police interrogation was custodial. The U.S. Supreme Court and this Court have repeatedly emphasized that whether a suspect is in custody is an objective inquiry. *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 131 S. Ct. 2394, 2402 (2011); *Sullivan*, 2013 VT 71, ¶ 28. The test is whether, given "all of the circumstances surrounding the interrogation," "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.*, 564 U.S. at 270, 131 S. Ct. at 2402 (quotations omitted); see also *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985).

¶ 15. ■ This Court has listed several nonexhaustive factors to consider in determining whether a suspect was in custody. "[T]he most important factor is whether police told the defendant that he or she was free to leave." *Sullivan*, 2013 VT 71, ¶ 29 (citing *State v. Hieu Tran*, 2012 VT 104, ¶ 14, 193 Vt. 148, 71 A.3d 1201). Other relevant factors that we have recognized include the location and duration of the questioning, the extent to which the suspect was confronted with evidence of his or her guilt, the use of deceptive police practices, and whether the officer was armed. *Id.* Additionally, the U.S. Supreme Court has recognized that a suspect's age, if known or apparent to a reasonable officer, is an objective factor that should be accounted for in the custody analysis. *J.D.B.*, 564 U.S. at 271-78, 131 S. Ct. at 2402-06. As the high court explained, a child's age "generates commonsense conclusions about behavior and perception" which "apply broadly to children as a class" and are "self-evident to anyone who was a child once himself." *Id.* at 271, 131 S. Ct. at 2403 (quotation omitted).

¶ 16. ██ ██ As noted, the record here contains very little about the content or progression of the interrogation itself. Nevertheless, for purposes of determining whether the interrogation was custodial in nature, certain salient facts are clear. First, there is no dispute that the officer here did not explain to E.W. or his foster parent that they were free to end the interview and leave. Although not dispositive, we have held that a clear communication from the police to the person being questioned about his or her freedom is "the most important factor" in determining whether a reasonable person would have felt free to terminate the interview and leave at any time. *Hieu Tran*, 2012 VT 104, ¶ 14. When the police are questioning a minor, the relative inexperience and vulnerability to authority of the youthful suspect renders this factor even more critical.

¶ 17. ██ A second factor that we have identified as significant in this context is "the interviewer's communication to the suspect of his belief in the suspect's guilt." *Id.* ¶ 12. The trial court here found no "evidence that [the officer] communicated his subjective belief that [E.W.] was guilty of the theft of the car to [E.W.] during the interview, or that he confronted [E.W.] with evidence of his guilt." Nevertheless, the record is clear that E.W.'s foster parent testified that the officer clearly spoke "his mind" with E.W., and further testified that at some point during the interrogation the officer "asked E.W. about where the car was," indicating that the police "were aware" he had brought the car to Derby "but didn't know where it had gone after that." This was consistent with the officer's statement to the GAL that he was eager to ask E.W. about the car's location for the sake of its owners.[6]

¶ 18. ██ A third relevant factor, as noted, is the suspect's age.[7] The U.S. Supreme Court has recognized that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go," and that courts may therefore "account for that reality" in their custody

------

[6] The dissent asserts that, in several instances, we are making factual findings contrary to those of the trial court, and this is one of them. Not so. Here, we simply note the undisputed testimony that the officer asked E.W. "about where the car was."

[7] The record leaves no doubt that the officer was aware that E.W. was a minor in foster care, although it is unclear whether he knew E.W.'s specific age.

analysis. *J.D.B.*, 564 U.S. at 272, 131 S. Ct. at 2403. Although at fifteen years of age, E.W. was two years older than the minor in *J.D.B.*, to speculate that his maturity, judgment, and ability to withstand the pressures of a police interrogation were thereby substantially different from that of a thirteen-year-old would be to employ the very reasoning the high court rejected in favor of "*commonsense* conclusions . . . self-evident to anyone who was a child once himself, including any police officer or judge." *Id.* (emphasis added); see also *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982) (noting that "the normal 16-year-old customarily lacks the maturity of an adult"). As the high court has observed, adolescents "lack the experience, perspective, and judgment" of adults, *id.*, and thus "cannot be viewed simply as miniature adults." *J.D.B.*, 564 U.S. at 274, 131 S. Ct. at 2404. This is not to say that a fifteen-year-old may never feel free to terminate a police interview, but only that we must be particularly vigilant to ensure that *other* factors support that conclusion. The officer's failure here to expressly inform E.W. and his foster parent of the right to terminate the interview thus becomes even more significant.

¶ 19. The dissent asserts that our analysis improperly weighs E.W.'s age as a factor indicating custody. The dissent argues that E.W.'s age does not support the finding that he was in custody for two reasons. First, the dissent notes that the record is unclear as to whether the officer knew E.W.'s precise age. We have acknowledged this fact, however, while also noting that the officer plainly knew that E.W. was a minor in foster care. The dissent also insists that a suspect's age is not "dispositive," and that the U.S. Supreme Court did not hold that "the thirteen-year-old in *J.D.B.* was automatically in custody by virtue of his age." *Post*, ¶¶ 33, 34. These are correct statements of the law, but are simply straw men in this context, as nothing that we have said or implied in this decision is remotely inconsistent with them. For the dissent to maintain, however, that nothing whatsoever about E.W.'s age was relevant to his perception as to whether he was free to terminate the officer's questioning is incorrect, and wars with the common-sense rule articulated by the U.S. Supreme Court.

¶ 20. ▮ Another factor that may be relevant to determining whether a reasonable juvenile would have felt free to terminate or leave a police interview is the presence or absence of an "independent adult." *In re J.E.G.*, 144 Vt. 309, 312, 476 A.2d 130, 132

(1984); see also *E.T.C.*, 141 Vt. at 379, 449 A.2d at 940 (setting forth criteria for determining whether juvenile's waiver of *Miranda* rights was voluntary, including opportunity to consult with independent adult genuinely interested in juvenile's welfare). The record here shows that E.W.'s foster father spoke with E.W. before the police interview commenced, was present during the interview, and twice interrupted the questioning to speak with E.W. in private. He also recalled, however, that what they discussed was "[h]onesty" — which he "encouraged" — and the difficulty of "doing the right thing." Thus, whether the foster parent's presence enhanced E.W.'s sense of freedom to decline to answer the officer's questions or actually undermined it is not entirely clear. See *E.T.C.*, 141 Vt. at 377-79, 449 A.2d at 938-40 (holding that director of group home who encouraged juvenile to "cooperate" with police and be "straight" failed to provide independent adult counsel and effectively coerced admissions).[8]

¶ 21.  The dissent claims that we erroneously consider the presence of an adult in the custody analysis. *Post*, ¶ 36. Again, the argument is baseless. We have acknowledged and discussed at length the distinction between the Article 10 and *Miranda* analyses, but nothing in our decisional law holds that the presence or absence of a disinterested adult may not be considered in determining whether a reasonable person in E.W.'s position would have felt free to leave. We do not take issue with the trial court's finding that the foster parent here was "genuinely interested" in E.W.'s welfare, but this does not gainsay the fact that he admittedly "encourage[d] E.W. to be honest" and talked to him about how it was "not always easy to do the right thing."

¶ 22.  Another relevant factor is the physical setting where the interview occurred. Here, the interview did not occur in an inherently intimidating or confining location like a police station or police cruiser, but rather ranged from inside the foster parent's house, to the front porch, to a nearby vegetable stand. An otherwise salient factor pointing away from a finding that the

---

[8] This is another instance where the dissent mistakenly asserts that we are "relying on facts contrary to the court's findings." *Post*, ¶ 38. The foster parent testified, and the trial court found, that the foster parent did not tell E.W. to do the right thing. The foster parent also testified, however, that he encouraged E.W. to be honest, and told him that it was "not always easy to do the right thing." These are not facts "contrary to the court's finding."

interview was custodial in nature loses some of its force, however, when E.W.'s circumstances are recalled: he was in state custody and living in a foster home where he had been placed some six to eight weeks earlier, and had recently — according to the officer — been reported as a "runaway." Thus, whatever comfort a minor might otherwise derive from the safety and familiar surroundings of the family home was hardly available here. Far from it. And whatever sense of freedom another teenager might otherwise feel was certainly not E.W.'s to enjoy, as a ward of the state living in an assigned placement. This is not to equate DCF custody with custody for *Miranda* purposes, but simply to recognize the reality that E.W.'s status was far less conducive to withstanding police authority than another minor in similar physical circumstances. See *J.D.B.*, 564 U.S. at 276, 131 S. Ct. at 2405 (holding that neither officers nor courts may ignore "the effect of objective circumstances that, by their nature, are specific to children").

¶ 23. Thus the record here leaves little room to conclude that a reasonable juvenile in E.W.'s circumstances would have felt free to terminate the police interview. The officer's failure to expressly inform E.W that he was free to terminate the questioning — which we have recognized as the single most important factor in the custodial analysis — looms even larger here, where the suspect was a juvenile, a ward of the state, and a foster-home resident. Absent *Miranda* warnings, therefore, we must conclude that E.W.'s admissions were improperly obtained, and that the motion to suppress should have been granted. Accordingly, the trial court judgment must be reversed.

*Reversed.*

¶ 24. **Dooley, J.,** dissenting. E.W. bore the burden of demonstrating that he was in custody at the time that he made incriminating statements, and he failed to make this showing. The facts as found demonstrate that the interview took place at E.W.'s home; the interview was conducted by one officer, who did not communicate a belief in E.W.'s guilt or confront E.W. with evidence of the crime; E.W. was free to move around; the interview was terminated at several points to allow him to consult with his foster father; and no deceptive interview techniques were used. Under these circumstances, a reasonable fifteen-year-old in E.W.'s situation would have felt free to leave and terminate the interview. Therefore, I would affirm the court's decision denying E.W.'s motion to suppress.

¶ 25. The pivotal question is whether E.W. was in custody at the time he made incriminating statements because police are not required to give *Miranda* warnings when suspects are not in custody. See *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966); *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) ("Suspects not in custody are not entitled to *Miranda* warnings.").

¶ 26. As the majority states, the determination of custody requires an objective inquiry into the totality of the circumstances to ascertain whether a reasonable person in the defendant's circumstances would feel free to refuse to answer and leave. *State v. Pontbriand*, 2005 VT 20, ¶ 11, 178 Vt. 120, 878 A.2d 227. The most important factor is whether police informed the defendant of the right to leave, but other factors are relevant, including the location of the interview, the extent the officer communicates his belief in the defendant's guilt, how the interview was initiated, whether a reasonable person would feel free to leave, and whether the defendant is confronted with evidence of his guilt. *State v. Sullivan*, 2013 VT 71, ¶ 29, 194 Vt. 361, 80 A.3d 67 (citing *State v. Muntean*, 2010 VT 88, ¶ 19, 189 Vt. 50, 12 A.3d 518). The inquiry is meant to focus on whether the situation approximates an " 'incommunicado interrogation of individuals in a police-dominated atmosphere.' " *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985) (quoting *Miranda*, 384 U.S. at 445).

¶ 27. In assessing these factors, the majority concludes that E.W. was in custody when he spoke with the officer primarily because: E.W. was not told that he was free to end the interview and leave; the officer confronted E.W. with suspicions and evidence of guilt; E.W.'s age made him more likely to believe he was not free to leave; and the setting of the interview in E.W.'s foster house and E.W.'s status being in the custody of the Department for Children and Families (DCF) made E.W. more likely to feel compelled to submit to police authority.

¶ 28. Apart from its conclusions, the majority's analysis is flawed in two significant ways. First, we are required to accept the facts found by the trial court unless we conclude that its findings are clearly erroneous. *State v. Oney*, 2009 VT 116, ¶ 11, 187 Vt. 56, 989 A.2d 995. The majority claims to give the trial court's findings deference, but nonetheless makes inferences from the record contrary to those findings. Second, although the majority recognizes that it is the defendant's burden to prove "that he was 'in custody' and, therefore, entitled to *Miranda* warnings," the ma-

jority makes inferences in E.W.'s favor that are not supported by record evidence. *State v. LeClaire*, 2003 VT 4, ¶ 15, 175 Vt. 52, 819 A.2d 719; accord *Pontbriand*, 2005 VT 20, ¶ 10.[9] In fact, those inferences must be drawn against E.W., who had the burden of

---

[9] The issue of which party bears the burden of proving a defendant was in custody and therefore entitled to a *Miranda* warning has not been squarely decided by the U.S. Supreme Court. Federal courts generally hold that the defendant bears the burden of proving he was in custody at the time the statements were made. See, e.g., *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming court's denial of defendant's motion to suppress because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109 and 88-2135, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989) (per curiam) (stating that defendant has burden of demonstrating that he was entitled to receive *Miranda* warnings because he was in custody); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (holding that defendant bears burden of demonstrating statements were obtained during custodial interrogation), *overruled on other grounds by United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc); *United States v. de la Fuente*, 548 F.2d 528, 533-34 (5th Cir. 1977) (explaining that defendant bears burden of production and persuasion in suppression hearing in absence of well-defined exceptions); *United States v. Artis*, No. 5:10-cr-15-01, 2010 WL·3767723, at *4 (D. Vt. Sept. 16, 2010) ("The weight of authority appears to hold that a defendant bears the burden of establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence."). But see *United States v. Charbonneau*, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997) (stating government has burden of proving that *Miranda* warnings were not necessary).

In addition to this Court, other state courts also agree that the burden rests on the defendant. See *State v. Vitale*, 497 A.2d 956, 963 (Conn. 1985) (holding defendant has initial burden of showing conversation was custodial interrogation); *State v. James*, 225 P.3d 1169, 1172 (Idaho 2010) ("We join the vast majority of courts that have considered the issue and hold that the burden of showing custody rests on the defendant seeking to exclude evidence based on a failure to administer *Miranda* warnings."); *Smith v. State*, 974 A.2d 991, 1003 (Md. Ct. Spec. App. 2009) (explaining that defendant bears burden of proving *Miranda* is applicable); *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005) (explaining that until defendant demonstrates that statement was product of custodial interrogation, State has no burden to show compliance with *Miranda*).

To be clear, once custody is established, the State bears the burden of demonstrating that a suspect received notice of his *Miranda* rights and waived them voluntarily. See *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) (holding that State bears burden of proving waiver of *Miranda* rights by preponderance of evidence); *Smith*, 974 A.2d at 1003 (explaining that once defendant demonstrates that *Miranda* is applicable burden is on State to show that its requirements were satisfied); *State v. Caron*, 155 Vt. 492, 506, 586 A.2d 1127, 1135 (1990) ("The State bears a heavy burden of proving a knowing and intelligent waiver of *Miranda* rights . . . .").

production as well as persuasion. With the exception of the majority's first consideration — that E.W. was not explicitly told he could terminate the interview or leave — the rest of the majority's analysis rests on facts not found by the trial court or found directly to the contrary, or inferences not supported by the evidence.

¶ 29. As to what the officer communicated to E.W. regarding E.W.'s guilt and whether the officer confronted E.W. with evidence of his guilt, the majority's findings conflict with those of the trial court. The majority acknowledges that the trial court found there was "no evidence" that the officer communicated his subjective belief that E.W. was guilty of theft or that he confronted E.W. with evidence of his guilt. Yet, the majority weighs this factor in favor of custody, inferring from E.W.'s testimony that the officer asked about the location of the car that police did communicate a belief in E.W.'s guilt. In reviewing the trial court's denial of a motion to suppress, we are required to follow the trial court's findings. Further, where the burden rests on defendant, this Court cannot draw inferences in his favor about what was communicated when there is no direct evidence in support.

¶ 30. In weighing the totality of the circumstances, the content of the conversation between police and a suspect is important to show whether the "questioning created the kind of coercive environment indicative of police custody." *State v. Hieu Tran*, 2012 VT 104, ¶ 16, 193 Vt. 148, 71 A.3d 1201 (quotation omitted). The conversation in this case bears no indication of coercion or police domination. The facts as found by the trial court and supported by the evidence show that the officer neither communicated his belief in E.W.'s guilt to E.W. nor confronted E.W. with evidence of his guilt. Further, there was no evidence that the questioning itself was coercive. Only one police officer was present, and the interview lasted at most an hour. There was no evidence that the police officer used any deceptive interview methods.[10] The police officer did not dominate or control the atmosphere of the interrogation. To the contrary, E.W. witnessed the officer speak to his GAL and wait for the foster father to speak to the GAL twice before the officer spoke to E.W. at all. The police officer allowed the foster father not only to be present but to participate, and to

---

[10] The record does not show whether the police officer was carrying a weapon when he interviewed E.W.

speak privately with E.W. before and during the interview. Therefore, this factor weighs against a finding of custody.

¶ 31. Similarly, the physical setting does not support a showing that a custodial situation existed. This was a casual encounter at E.W.'s home in a location unlike the police-dominated atmosphere typical of a custodial situation, such as a police station or a police cruiser. See *Sullivan*, 2013 VT 71, ¶ 30 (considering fact that interview took place in defendant's home as supporting conclusion that defendant was not in custody); *In re D.A.C.*, 741 S.E.2d 378, 382 (N.C. Ct. App. 2013) (concluding juvenile not in custody based in part on facts that he was questioned outside his home in open area). The interview began in the foyer of the residence and moved outside to a less restrictive environment. During the questioning, E.W.'s freedom of movement was not restrained in any way. Rather than isolating E.W. in a room and insisting that he stay within sight, the officer allowed the interview to roam from house to porch to vegetable stand as circumstances dictated — from an enclosed space to a relatively unenclosed space. Additionally, E.W. was not taken into custody at the end of the interview.

¶ 32. The majority does not find these facts significant, holding that because E.W. was in DCF custody and living in a foster home, he did not draw comfort from the fact that the interview took place in a familiar setting or that he had family members close by. But this conclusion is based on conjecture and not record evidence. Certainly, E.W.'s status as a juvenile in DCF custody does not equate to being in police custody for purposes of whether *Miranda* applies. These are two very different concepts although the descriptive term used is the same. If defendant had been living with his natural parents, he would have been in their custody in the same way that he was in DCF custody. While DCF custody is a matter of who has control over care for the child, the custody inquiry under *Miranda* focuses on whether the suspect was " 'deprived of his freedom *by the authorities* in any significant way.' " *Pontbriand*, 2005 VT 20, ¶ 14 (quoting *Miranda*, 384 U.S. at 478). The majority recognizes that the concepts are different and yet weighs E.W.'s status as indicative of custody. Further, there was no particular evidence to suggest that E.W. was not comfortable in his foster home or with his foster family and so the location of the interview was less informal than for other suspects interviewed in their homes. When the facts are viewed objectively,

the physical setting of the interview leads to only one conclusion — that E.W. was not in custody during questioning.

¶ 33. The majority also weighs E.W.'s age as a factor indicating custody even though there is no evidence or findings to demonstrate whether the officer knew E.W.'s specific age, or whether E.W.'s age made him more likely to feel pressured to submit to police questioning and not feel at liberty to leave. Certainly, a suspect's age is relevant to whether a situation was custodial. As the U.S. Supreme Court has held, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *J.D.B. v. North Carolina*, 564 U.S. 261, 277, 131 S. Ct. 2394, 2406 (2011). The juvenile's age is not dispositive, however, and must be weighed with all other relevant factors to determine if the situation was custodial. *Id.* at 277, 131 S. Ct. at 2406 ("This is not to say that a child's age will be a determinative, or even significant, factor in every case.").

¶ 34. To find it significant, the majority basically equates E.W. with the thirteen-year-old in *J.D.B.*, and concludes that E.W. would not have felt free to withstand police questioning. There are several problems with this conclusion. First, the U.S. Supreme Court did not state that the thirteen-year-old in *J.D.B.* was automatically in custody by virtue of his age. The Court merely stated that the factor had to be considered along with others and that common sense should be used to determine how a juvenile's age would affect his objective perception of the situation. *Id.* at 279-80, 131 S. Ct. at 2407 (explaining that police can use common sense to judge gradations of abilities of differently aged children). Second, the record demonstrates that the officer knew E.W. was in foster care, but no evidence was submitted to show that the officer knew E.W. was fifteen or that E.W.'s age was objectively apparent to the officer.[11] Third, even assuming that the officer could determine that E.W. was fifteen, the record does not

---

[11] The majority explains that even though the officer did not know E.W.'s precise age, this is immaterial because the officer was aware that E.W. was a minor in foster care. This fact alone, however, simply means that E.W. was less than eighteen years old. 33 V.S.A. § 5103(c) (explaining that jurisdiction of family court over child in delinquency or child-neglect proceeding generally extends to child's eighteenth birthday).

demonstrate that E.W.'s age made him more likely to perceive that he was in a custodial situation.

¶ 35. Common sense demonstrates that a fifteen-year-old juvenile is more responsible than a younger child and able to understand whether a situation has created a "restraint on freedom of movement of the degree associated with a formal arrest." *Sullivan*, 2013 VT 71, ¶ 29 (quotation omitted) (explaining that custody is created when suspect is arrested or placed under conditions approximating arrest). Vermont law recognizes this fact, treating juveniles differently depending upon the nature of the alleged crime and the age of the juvenile. A juvenile of fourteen or fifteen years of age is ordinarily treated as an adult if charged with one of twelve major, violent crimes. See 33 V.S.A. §§ 5102(2)(C)(ii), 5204(a). A juvenile of sixteen or seventeen years of age may be treated as an adult for any crime. *Id.* § 5204(a). Here, given the other circumstances — that E.W. was questioned by one police officer in a familiar setting and with family members close by — there is nothing to indicate that a reasonable fifteen-year-old in E.W.'s circumstances would perceive that he was under arrest and not free to leave.[12] See *In re N.J.*, No. COA13-53, 2013 WL 5460091, at *7 (N.C. Ct. App. Oct. 1, 2013) (unpub.) (concluding that reasonable fifteen-year-old in juvenile's situation would not have believed he was under arrest and therefore situation was not custodial).

¶ 36. The majority makes an additional error by stating that "the presence or absence of an independent adult may have some bearing on whether E.W. was in custody." *Ante*, ¶ 13. In *In re E.T.C.*, 141 Vt. 375, 449 A.2d 937 (1982), this Court held that a juvenile cannot voluntarily and intelligently waive his rights against self-incrimination and to counsel without first consulting with an impartial adult, who is genuinely interested in the juvenile's welfare, independent from the prosecution, and aware of the juvenile's rights. *Id.* at 379, 449 A.2d at 940. Our cases have made it clear, however, that the ability to consult with an interested adult becomes relevant only if the situation is custodial

---

[12] This does not amount, as the majority claims, to a conclusion that E.W.'s age was not "relevant to his perception as to whether he was free to terminate the officer's questioning." *Ante*, ¶ 19. Certainly, E.W.'s age is one relevant factor to consider. The question is whether it is a significant factor. Here, there is simply nothing in the record to indicate that E.W.'s age was known to the officer or that E.W.'s age was particularly significant in this case.

to then determine whether a juvenile has voluntarily and intelligently waived his rights. *State v. Piper*, 143 Vt. 468, 473, 468 A.2d 554, 557 (1983). There is no right to consultation for noncustodial police questioning because this could "cause unwarranted and prejudicial delay in investigatory situations when time is often of the essence." *Id.* In this case, the majority improperly considers the presence of an independent adult in its analysis of whether custody existed.

¶ 37. To the extent that the presence and involvement of E.W.'s foster father was relevant at all, it was relevant to the physical setting of the interview, and when considered as part of that factor weighs against a finding of custody. See *Muntean*, 2010 VT 88, ¶ 23 (explaining that physical setting of interview important to custody determination because it influences reasonable person's feeling on whether he or she is at liberty to leave). The trial court found the foster father was "genuinely interested" in E.W.'s welfare and was an active participant in the questioning. He consulted with E.W. prior to the interview and interrupted the interview when it appeared E.W. might incriminate himself to speak privately with E.W. on several occasions. In addition, although the foster father "spoke about honesty" in private with E.W., he "did not instruct [E.W.] that he had to speak to the trooper, nor did he tell [E.W.] that '[E.W.] should do the right thing.' " This discussion with E.W. did not create a coercive police environment. See *In re D.A.C.*, 741 S.E.2d at 383 (concluding that fact that juvenile's parents told him to speak honestly did not create custodial interrogation because it did not create government coercion). These facts, if anything, would demonstrate to a reasonable juvenile in E.W.'s situation that he was free to terminate the interview at any time.

¶ 38. The majority discounts the importance of the presence of the foster father by relying on facts contrary to the court's findings. The trial court found, based on the evidence, that the foster father *did not* tell defendant to do the right thing in the interview. Despite this finding, the majority emphasizes testimony to the effect that the foster father discussed honesty with E.W. and the difficulty of doing the right thing. *Ante*, ¶ 21.

¶ 39. It may be that if E.W. had put on a thorough and complete case to meet his burden, the record would support as a matter of law that he was in custody and should have been provided *Miranda* warnings such that his confession would be

suppressed. As the majority admits, "very little testimony was adduced about [the interview's] specific content or progression." *Ante,* ¶ 6. The foster father was a witness and was present throughout the interview. Defense counsel could have elicited the missing testimony. On the record before us, however, E.W. failed to demonstrate that he was in custody when he made the statements he now seeks to suppress. E.W. failed to show that he was subjected to an environment that was coercive, police-dominated, or approximating an arrest. To the contrary, the facts demonstrate that E.W. was questioned in a familiar setting by one officer, who did not use coercive interview techniques and neither confronted E.W. with evidence of guilt nor expressed a belief in E.W.'s guilt, E.W. was free to move around and consult with others, and E.W. was not taken into custody. Given these facts, the court .properly denied the motion to suppress, and I would affirm.