NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 116

No. 2013-477

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Adam Winters | November Term, 2014 |

David Suntag, J.

David W. Gartenstein, Windham County Deputy State's Attorney, Brattleboro, for
 Plaintiff-Appellee.

Matthew F. Valerio, Defender General, Anna Saxman, Deputy Defender General, and Sara Puls,
 Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **EATON, J.** Defendant appeals from his conditional guilty plea to possession of cocaine, challenging the trial court's denial of his motion to suppress. Defendant maintains that he was illegally seized when a police officer approached his parked car twice in a short period and, during the second encounter, asked him pointed questions about drugs. We agree, and therefore reverse and remand the trial court's decision.

¶ 2. The events that gave rise to defendant's motion to suppress occurred in the early morning hours of June 27, 2012, at the Vermont Welcome Center rest area, just off I-91 in Guilford. The rest area is open twenty-four hours for motorists to use the restrooms and purchase refreshments. Around 1:00 a.m., a Vermont state trooper was checking license plates

in the rest area parking lot when he identified a vehicle as belonging to a woman whose license was suspended. The trooper approached the vehicle and observed defendant, a male, asleep in the driver's seat. The trooper did not make contact with defendant at this time.

¶ 3. The trooper returned to his cruiser and searched the police database, where he learned that a white male named Adam Winters, whose license was also suspended, lived at the same address as the woman who owned the car. The trooper returned to the vehicle and knocked on the window, waking the occupant who confirmed that he was Adam Winters.[1] The trooper asked defendant why he had been driving with a suspended license. Defendant explained that he had been driving north on I-91 in Massachusetts around 10:00 p.m. when he hit a deer near the Vermont border, disabling his headlight. According to defendant, a Massachusetts state trooper advised him to park overnight at the rest area rather than drive with one headlight. Defendant confirmed that he was driving his girlfriend's car and told the trooper that she was going to pick him up in the morning. When the trooper inquired about defendant's whereabouts in Massachusetts, defendant could not provide a specific answer.[2] The trooper told defendant not to drive without a license and to make sure that someone else picked up the car. The trooper left the scene without issuing defendant a citation, telling defendant to "rack out."

¶ 4. Ten to fifteen minutes later, by the trooper's estimate, the trooper returned to the scene with another trooper. He had learned that defendant had been arrested several times, with his most recent drug arrest in 2005. The trooper again knocked on defendant's window, rousing defendant from sleep. The trooper said that he had learned that defendant had been arrested for

---

[1] Although this was actually the officer's second approach to defendant's vehicle, it was officer's first personal interaction with defendant and we refer to it as the first approach in this opinion.

[2] The video indicates that the trooper asked defendant "Where in Mass?" and defendant answered, "Uh . . . I dropped my buddy off there dude. And I just dropped him off and headed back up." After the sound "uh," there is a significant pause during which defendant appears to be muttering something. The content is low in volume and inaudible.

"some drug stuff in the past" and asked defendant if he was still involved in the drug trade. Defendant replied "no," and said that he had been taking Suboxone for four years.[3] The trooper responded that he was glad that Suboxone was working for defendant. The trooper then asked, "Given your history, coming from Massachusetts, you haven't really told me where you're coming from. Do you have anything that you're not supposed to have on you? Do you have anything in the car you shouldn't possess?" Defendant responded that he had needles but that they were old.[4] The trooper then asked defendant if he would give consent to search his person or the vehicle. Defendant replied that he just wanted to go back to sleep. The trooper then said, "What's gonna happen is I've got a canine coming down. He's gonna check the car. If he alerts to the car, everything's getting seized."

¶ 5. At this point, defendant reached over toward the passenger seat where the trooper could not see. The trooper ordered defendant to stop. Defendant opened the door, and the trooper noticed a knife on the passenger seat. Defendant reached for the knife. The trooper pulled out his gun, and defendant put down the knife and exited the vehicle. After exiting the

---

[3] Suboxone is a drug prescribed to treat opiate addiction.

[4] Defendant's initial response regarding the needles went as follows:

> Defendant: No, just got some used needles in here.
>
> Trooper: Used needles?
>
> Defendant: No, not used, new.
>
> Trooper: Are you a diabetic?
>
> Defendant: Nope, they're old.
>
> Trooper: They're old? Okay. Other than needles, do you have anything else in the car?
>
> Defendant: No, sir.

Later in the encounter, defendant stated that he shoots the Suboxone with the needles. When the officer responded that Suboxone does not come in a form to be injected, defendant answered that he puts it in water.

vehicle, defendant eventually consented to search of his person. The trooper again asked defendant for consent to search the vehicle, informing defendant that if he did not consent and the dogs alerted to the car, he would seize the car and apply for a search warrant. Defendant eventually signed a consent form authorizing the troopers to search the vehicle. According to the trooper's affidavit, the entire encounter lasted approximately fifty minutes from the time he first woke defendant to the time defendant signed the consent card.

¶ 6. In the car, police found a small quantity of crack cocaine, eleven clear plastic glassine baggie corners with white powder residue, and a crushed soda can with cocaine residue. Defendant admitted that he had used the can to smoke crack cocaine earlier that day and that he had purchased the crack cocaine from a dealer in Holyoke, Massachusetts. Defendant stated that he made a trip to purchase crack cocaine approximately once per month and smoked it for stress relief. Defendant was subsequently charged with possession of cocaine.

¶ 7. In October 2012, defendant moved to suppress the evidence against him, arguing that there were no facts to warrant the trooper approaching his car. Defendant asserted that he had been illegally seized when the trooper awoke him a second time, with a second trooper present, and asked pointed questions about his drug history. Defendant was told that there was a canine unit en route if he was unwilling to cooperate. Defendant noted that this was the second time that he had been approached and each time the police involvement increased. Defendant maintained that a reasonable person, under these circumstances, would not have felt free to terminate the police encounter. Absent any reasonable and articulable suspicion of criminal activity, defendant argued, the trooper had no legal reason to stop him. Thus, according to defendant, the court must find that he was illegally seized and all evidence obtained as a result of the seizure must be suppressed.

¶ 8. The State opposed the motion. It argued that no seizure occurred until approximately 2:00 am. At that point, defendant told the trooper that he was using Suboxone

4

and that he had hypodermic needles in the car, and the trooper asked defendant for consent to search the car, indicated that a narcotics canine was en route, and communicated that he would be seizing defendant and his car if the canine alerted to the presence of drugs. The State maintained that this encounter and all of the trooper's encounters with defendant were supported by reasonable suspicion of a motor vehicle violation and criminal activity. The State also noted that defendant's actions, including his initial declination of consent to search, his indication that he did not want to do anything, and his declaration that he was going back to sleep, all demonstrated that a similarly situated reasonable person would not have felt obligated to answer police questions and would not have concluded that he was being detained.

¶ 9. Following a July 2013 hearing, and additional filings by each side, the court denied the motion to suppress. It found that although the trooper's first encounter with defendant appeared to have been consensual, the trooper developed sufficient information during this encounter to justify his final approach. The court determined that defendant was operating a motor vehicle with his license suspended in violation of 23 V.S.A. § 674, an ongoing violation that fully justified stopping him as long as he was in the driver's seat of the car. The court found that even if the trooper intended to pursue a drug investigation, his subjective motivation was irrelevant. Objectively speaking, the court reasoned, defendant's suspended license provided a sufficient basis for the stop. In the course of that stop, the troopers developed sufficient information to justify an escalation of the investigation, i.e., defendant was in possession of hypodermic needles for a drug that is not administered intravenously and he had a prior drug conviction.

¶ 10. In reaching its conclusion, the court noted that its decision was limited to the facts found. If either of the first two interactions between the trooper and defendant had, in fact, amounted to a detention or seizure for the traffic violation and had that traffic offense investigation reached a conclusion, it would be more arguable that the third approach with little

5

additional information other than defendant's prior drug-related offense record would not have justified another seizure. The court concluded, however, that those facts were not present here. The court thus denied defendant's motion. Defendant entered a conditional guilty plea, reserving the right to appeal the trial court's order denying his motion to suppress. This appeal followed.

¶ 11. On appeal, defendant argues, as he did below, that his second encounter with the trooper was an illegal seizure in violation of the Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution. Specifically, defendant asserts that the driving-with-a-suspended-license (DLS) investigation had concluded, and that the trooper needed, and lacked, reasonable suspicion to conduct a drug investigation.[5] We agree that defendant was illegally seized at the outset of the second face-to-face encounter with the trooper, and thus, his motion to suppress should have been granted.[6] See State v. Button, 2013 VT 92, ¶ 8, 195 Vt. 65, 86 A.3d 1001 (on review of denial of motion to suppress, Supreme Court reviews factual findings for clear error and reviews legal conclusions de novo).

¶ 12. The Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution protect citizens against unreasonable searches and seizures. U.S. Const. amend. IV (providing that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Vt. Const. ch. I, art. 11 (providing that "the people have a right to hold themselves, their houses,

---

[5] The State claims that defendant failed to preserve two points for our review: one, that defendant was seized upon his first encounter with the trooper; and two, that the trooper terminated the suspended license investigation at the end of the first encounter and could not resurrect the investigation during the second encounter. As to the first issue, defendant correctly points out that he does not take that position on appeal but merely addressed the nature of the first encounter in a footnote in his brief. As to the second issue, defendant also correctly points out that he raised this at the motion hearing and in his post-hearing motion in support of his request to suppress.

[6] Defendant also contests the voluntariness of his consent to search the vehicle, arguing that he merely acquiesced to the trooper's claim of lawful authority. While defendant did not reserve the right to raise this issue in his conditional plea, our conclusion on defendant's motion to suppress renders a discussion of this issue unnecessary.

papers, and possessions, free from search or seizure"); see State v. Berard, 154 Vt. 306, 309, 576 A.2d 118, 120 (1990) (noting that, although Article 11 does not expressly limit protection to "unreasonable" searches, we consistently have imported "reasonableness" standard of Fourth Amendment into Article 11).

¶ 13. The law with respect to automobile seizures is well developed. Normally, a seizure requires that an officer have probable cause that a defendant has committed a crime. See U.S. Const. amend. IV. In Terry v. Ohio, however, the United States Supreme Court developed a very circumscribed exception to the probable-cause requirement for seizures that are limited in their scope and duration and do not rise to the level of full arrests. 392 U.S. 1, 27-29 (1968). Such an intrusion must be justified by reasonable and articulable suspicion of criminal activity and cannot be based on the officer's "inchoate and unparticularized suspicion or 'hunch.' " Id. at 21, 28; see State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280 (same).

¶ 14. Reasonable suspicion of a traffic violation can form the basis for a valid stop,[7] State v. Lussier, 171 Vt. 19, 34, 757 A.2d 1017, 1027 (2000), but the detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. Florida v. Royer, 460 U.S. 491, 500 (1983); State v. Sprague, 2003 VT 20, ¶ 17, 175 Vt. 123, 824 A.2d 539. If, during the course of an investigative stop, an officer gathers additional information providing reasonable suspicion that some other criminal activity is afoot, the officer may extend the detention to investigate that activity. State v. Cunningham, 2008 VT 43, ¶ 15, 183 Vt. 401, 954 A.2d 1290. " 'In determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and

---

[7] While in the common search and seizure parlance the term "stop" is shorthand for a seizure, there can be a seizure without a stop. This case arguably involves such a situation. In fact, use of the term stop in this case leads only to confusion.

articulable suspicion of wrongdoing.' " State v. Davis, 2007 VT 71, ¶ 7, 182 Vt. 573, 933 A.2d 224 (mem.) (quoting Lussier, 171 Vt. at 23-24, 757 A.2d at 1020). That an officer's true motivation for stopping a vehicle or approaching an individual is to investigate drug possession or other criminal activity has no bearing on the legality of the detention, so long as, from an objective standpoint, the officer had reasonable and articulable suspicion of a traffic or other violation.

¶ 15. Defendant concedes that he was not seized during his first face-to-face encounter with the trooper and we find it unnecessary to address whether a seizure in fact occurred. The first face-to-face encounter ended when the trooper told defendant to "rack out." We reject the notion that there was an "ongoing" DLS violation that authorized the trooper to continue to approach the car again and again, as long as defendant sat behind the wheel. It is evident that the trooper had concluded the DLS investigation, and a reasonable person in defendant's position would have concluded that the DLS matter had been completed as well. Because defendant concedes that he was not seized during his first encounter with the trooper, moreover, cases addressing the circumstances under which a lawful seizure may be extended are inapposite. See, e.g., Arizona v. Johnson, 555 U.S. 323, 333 (2009) (explaining that lawful roadside stop begins when vehicle pulled over for investigation of traffic violation, and temporary seizure remains reasonable for duration of stop, and stating that officer's inquiries into matters unrelated to justification for traffic stop do not convert encounter into something other than lawful seizure as long as those inquiries do not measurably extend duration of stop); see also Rodriguez v. United States, 135 S. Ct. 1609, 1612, 1615 (2015) (holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," and that this rule applies to dog sniff, which cannot be characterized as part of officer's traffic mission).

¶ 16.    We have recognized that, employing a totality-of-the circumstances analysis, there is a point at which "mere questioning or field inquiry" constitutes "a detention requiring some level of objective justification." State v. Pitts, 2009 VT 51, ¶ 8, 186 Vt. 71, 978 A.2d 14. In deciding if this point has been reached, we must consider the officer's conduct "as a whole," mindful that " 'what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.' " Id. (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)).  Both this Court and other courts have held that although " 'mere questioning' may not constitute a seizure per se, pointed questions about drug possession or other illegal activity in circumstances indicating that the individual is the subject of a particularized investigation may convert a consensual encounter into a Terry stop requiring objective and articulable suspicion under the Fourth Amendment." Id. ¶ 9.   As stated above, we consider the totality of the circumstances in deciding if a seizure has occurred, and we reject the dissent's contention that we are applying a "per se" rule here.

¶ 17.    While the facts of Pitts might be distinguishable from the instant case, the legal principles enunciated therein are applicable.  Additionally, the out-of-state cases that we relied on in Pitts are directly analogous here.  In State ex rel. J.G., 726 A.2d 948 (N.J. Super. Ct. App. Div. 1999), for example, a police officer approached an adult and a juvenile in a train station, having observed behavior that led the officer to believe that the pair were engaged in drug trafficking.  The officer asked the individuals where they had been coming from, and received contradictory answers.  In a conversational tone, the officer asked the adult if there was "anything on him that I should know about." Id. at 950.  The adult replied "no," and invited the officer to perform a pat-down, which the officer did.  At no time did the officer draw his weapon, threaten either individual, or restrain their movement.  He did not tell the pair that they had to stop or that they were not free to leave.

9

¶ 18. After patting down the adult, the officer asked the juvenile "if there was anything on him that he shouldn't have." Id. The juvenile also said "no," and agreed to a pat-down. The officer found a box of cigar holders associated with smoking marijuana. He then asked the juvenile what was in his backpack. The adult responded that it contained jackets. The officer then asked the juvenile, "Do you mind if I search the backpack?" The juvenile agreed although he appeared to be in a state of "sheer panic." Id. at 951. Inside the backpack, the officer found numerous small plastic bags, which he recognized as drug-sale paraphernalia, as well as three bags of marijuana.

¶ 19. The court concluded that although the encounter between the officer and the juvenile began as a field inquiry, it turned into a seizure when the officer asked questions that presupposed criminal activity, i.e., whether the juvenile had anything on him that he shouldn't have. Id. at 953. The court reached this conclusion even though the officer's tone and manner were "unexceptional," and the officer made no demands nor issued any commands. Id. The court considered the officer's initial words "unduly authoritative, indicative of a criminal suspicion, and harassing." Id. It found that the officer's question would make a reasonable person believe that he was the subject of a particularized investigation, and thus, at that point, the field inquiry was automatically converted to a Terry stop that required a reasonable and articulable suspicion before a search was conducted. Id. at 953-54.

¶ 20. The Utah Supreme Court engaged in a similar analysis in State v. Alverez, 2006 UT 61, ¶ 12, 147 P.3d 425. In that case, two police officers waited for the defendant and then surprised him alone in a residential parking lot. They asked the defendant if he knew that his vehicle was uninsured and then stated that the vehicle was suspected of being connected to drug dealing. Id. ¶¶ 5-6. The defendant denied any knowledge of drug dealing, and denied having any drugs on him. The defendant subsequently tried to swallow fifteen drug-filled balloons and the officers prevented him from doing so.

10

¶ 21.    The court found that the defendant had been seized, although it did not specify the point at which the seizure occurred.  "Under the circumstances in this case," it explained, "where two uniformed police officers waited for and then approached [the defendant] and accused him of not one, but two illegal acts—lack of car insurance and drug trafficking—a reasonable person would not have felt free to leave."  Id. ¶ 11.  The court recognized that the police may ask individuals potentially incriminating questions, and that questioning alone does not automatically constitute a seizure.  Nonetheless, "the manner of questioning, the content of the questions, and the context in which the questions are being asked can convert 'mere questioning' into a . . . seizure if, under all of the circumstances, a reasonable person would not feel free to leave."  Id. (footnote omitted).  The court considered the officers' first two questions to be accusatory, and given the context in which the questions were asked, concluded that this demonstrated a " 'show of authority' sufficient to restrain [the defendant's] freedom of movement."  Id. ¶ 12.

¶ 22.    The New Mexico Supreme Court similarly recognized in State v. Jason L., 2000-NMSC-018, 2 P.3d 856, that "questions asked in an accusatory, persistent, and intrusive manner can make an otherwise voluntary encounter coercive."  Id. ¶ 17 (quotation and alterations omitted).  Other courts have reached similar conclusions as well, as we explained in Pitts, 2009 VT 51, ¶ 13.  See, e.g., United States v. Nunley, 873 F.2d 182, 184-85 (8th Cir. 1989) (holding that consensual encounter became seizure which invalidated subsequent consent to search where police officers' statements to the defendant that they were attempting to stop the flow of drugs indicated that the defendant was the "particular focus of a narcotics investigation"); State v. Contreras, 742 A.2d 154, 160-61 (N.J. Super. Ct. App. Div. 1999) (concluding that narcotics officers "clearly conveyed to defendants the message that the officers suspected them of criminal activity," which escalated consensual encounter to seizure where the officers had defendants exit a train, explained that they were investigating drug trafficking, and asked defendants if they were carrying any contraband); Parker v. Commonwealth, 496 S.E.2d

11

47, 49, 51 (Va. 1998) (holding that, where police clearly followed the defendant and then "asked the defendant if he had any guns or drugs in his possession," a reasonable person would not have believed that he was free to leave).

¶ 23.   We reach the same conclusion here.   While the officer's first approach did not constitute a seizure, it provides an important context for the second approach.   After talking initially with defendant, the trooper informed defendant that he was free to go to sleep.   This would signify to a reasonable person that the encounter was over.   Nonetheless, the trooper re-approached the car thereafter, this time accompanied by a second trooper.   He knocked on the window, waking defendant up a second time.   The fact that the officer had already concluded his exchange with defendant and then came back with an additional law enforcement officer distinguishes this case from a situation where an officer encounters someone and asks a few questions.   At the time of the second face-to-face encounter, the trooper was conducting a drug investigation and he had by that point called for back-up and a drug-detecting dog.

¶ 24.   The officer began his second round of questioning with a specific assertion reflecting an individualized investigation of defendant's background.   He referred to defendant's arrest record, and his initial question to defendant was "are you still in the drug trade?"   This was not an "open-ended" or innocuous question.   Instead, it was accusatory, intrusive, and it presupposed criminal activity related to drugs despite the most recent indication of any drug involvement by defendant being in 2005.   There is a significant difference between this type of questioning and the type of generalized questions involved in the cases cited by the dissent. Post ¶ 43.[8]   The officer's individualized focus on this particular defendant has a significant

---

[8]   One of the cases cited by the dissent, United States v. Jones, 701 F.3d 1300, 1314-15 (10th Cir. 2012), did involve an accusatory question.   In that case, after identifying himself as a law enforcement officer conducting a drug investigation, the officer stated to the defendant, "I'm here for your marijuana plants." Id. at 1305.   The Jones court concluded that despite the "accusatory nature" of this question, and the "somewhat jolting" effect it would have on a reasonable person, a reasonable person under the totality of the circumstances surrounding this

bearing on whether a reasonable person in defendant's position would feel free to terminate the encounter. The fact that the officer returned with a second trooper is also relevant in assessing whether a reasonable person would feel that he or she was subject to a particularized inquiry and was not free to terminate the encounter.

¶ 25. Following his initial question, the officer continued to question defendant in the same vein, asking defendant if he had anything that he should not possess on him or in his car. This is the precise question at issue in J.G., a question that the New Jersey court aptly characterized as "unduly authoritative, indicative of a criminal suspicion, and harassing." 726 A.2d at 953. It is also worth noting that the officer never told defendant that he was free to terminate the encounter. See Florida v. Bostick, 501 U.S. 429, 432, 437 (1991) (finding it significant that officers specifically told defendant that he could refuse to consent to search of his luggage in assessing whether seizure occurred); see also Jones, 701 F.3d at 1314 (recognizing that although police officers are not required to inform individual that he or she is free to leave, their failure to do so "is a factor to consider" in assessing totality of circumstances). At this point in the exchange, just as in J.G., a reasonable person would have felt he was the subject of a particularized inquiry, and would not have felt "at liberty to ignore the police presence and go about his business." Bostick, 501 U.S. at 437 (quotation omitted). It is significant that the second encounter occurred after the first had conclusively ended. The officer had left the scene, telling defendant to "rack out." Given this instruction to defendant, the officer's subsequent return to the scene would make a reasonable person less likely to believe that he could voluntarily terminate the encounter.

---

encounter would not have been "so cowed by such an accusatory assertion that he would have believed that he was not free to discontinue the encounter and go about his business." Id. at 1314. As is evident, we are faced here with a different "totality of the circumstances," and we have reached a different conclusion based on the facts presented here.

13

¶ 26. The officer's actions here—approaching and waking defendant, concluding the first interaction, and then returning with a second trooper, waking defendant again, and asking him pointed questions about criminal activity—is not the type of "mere questioning" described in Bostick. Indeed, this Court has taken a very narrow view of Bostick, construing it to hold "merely that general police questioning within the confines of a bus did not establish a seizure 'per se.'" Pitts, 2009 VT 51, ¶ 18.

¶ 27. Consistent with our holding in Pitts, and the cases discussed therein, we conclude that the officer's field inquiry was converted into a Terry stop at the outset of the second encounter when the officer asked pointed questions of defendant. At that point, the officer did not have reasonable suspicion of criminal activity. He had not gleaned any information on his first approach to indicate that defendant had any contraband, and defendant's stale arrest record did not provide the officer with reasonable suspicion. We should not countenance a seizure "based on luck and hunch." Contreras, 742 A.2d at 161 (quotation omitted). The officer had nothing to suggest any current drug activity beyond defendant's comments that he had been coming from Massachusetts, a comment which hardly supports a suspicion of drug possession. A prior arrest nearly a decade earlier does not continue to render defendant subject to pointed questions about his drug use indefinitely absent some reasonable articulable suspicion justifying the seizure. The officer was acting solely upon his hunch of current drug possession based primarily upon stale information. This hunch did not amount to reasonable articulable suspicion. Because defendant was illegally seized, his subsequent "consents" to the search of his person and car, which occurred very shortly thereafter, were "tainted and ineffective." Sprague, 2003 VT 20, ¶ 31 (reaching similar conclusion); see also Pitts, 2009 VT 51, ¶ 20 (concluding that where officers had no reasonable and objective basis to suspect that defendant was engaged in any criminal activity sufficient to justify investigative detention, detention was therefore "plainly invalid . . . and it is equally plain that the illegal detention irremediably tainted the consensual

14

search of [the defendant's] person which immediately followed"). The motion to suppress should have been granted.

Reversed and remanded.

FOR THE COURT:

_____
Associate Justice

¶ 28.   **DOOLEY, J., dissenting.**   The majority essentially creates a "per se" rule that asking "pointed questions" about possible criminal activity transforms a consensual encounter between a police officer and a citizen into a seizure under the Fourth Amendment to the United States Constitution.  In doing so, it ostensibly relies on our decision in State v. Pitts, 2009 VT 51, 186 Vt. 71, 978 A.2d 14, and certain decisions from other jurisdictions that support Pitts.  But the majority's per se rule goes well beyond Pitts and beyond the decisions in any other jurisdiction, except one.  Further, its reliance on the term "pointed questions" creates a vague standard, one that no other jurisdiction adopts in defining a Fourth Amendment seizure.  For these reasons, I dissent.

¶ 29.   On the facts of this case, I do not agree that defendant was illegally seized during the second encounter with the trooper.  The second encounter was consensual, at least up until defendant's disclosure that he was carrying needles, which created reasonable suspicion of criminal activity, when combined with other factors.  Even if I agreed with the majority that defendant was illegally seized, I would not join its mandate because defendant waived his right to appeal the voluntariness of his consent to search.  I would affirm the judgment of the trial court.

¶ 30.   Before turning to the specific issues in this case, I return to my characterization of the majority's rationale and its assertion that it is relying upon the totality of the circumstances,

not just one factor. There were two direct encounters between defendant and the trooper—defendant did not challenge the first encounter as a seizure, but the majority concludes that the second encounter became a seizure. In both instances, defendant was not free to leave the rest area because his vehicle was inoperable and he had no valid driver's license. Other than the presence of "pointed questions" about drug possession or usage during the second encounter, only two other factors are cited by the majority as relevant to its conclusion that the second encounter involved a seizure: (1) that the trooper did not inform defendant that he was free to refuse to answer his questions and (2) that the second encounter was just that, a "second encounter." The first factor was not present during the trooper's first encounter with defendant, and the majority mentions it only in passing as "worth noting." Ante, ¶ 25. Although none of our prior cases involves a conversation between an officer and a defendant in which the officer informed the defendant that he was free to refuse to answer the questions, we never have considered that factor in determining whether a seizure occurred. This is true for Pitts, the primary Vermont precedent on which the majority relies, which purports to discuss all the relevant factors. Additionally, defendant never raised this factor on appeal here. Finally, in mentioning this factor, the majority primarily relies on the point raised in Florida v. Bostick, 501 U.S. 429 (1991), that the officer informed the defendant of his right to refuse consent to a search. Id. at 437. The trooper here made exactly that same statement to defendant as did the officer in Bostick. For these reasons, I do not believe that this factor helps explain the majority's decision.

¶ 31. I have the same view of the second factor. It is clear that the trooper returned once he discovered that defendant had an extensive criminal record, including some drug offenses. Defendant eventually revealed to the trooper that he had eleven felony convictions.[9] Obviously, once the trooper became aware of defendant's extensive criminal record, he would

---

[9] The record does not specify exactly what the trooper relied upon, but we know that he conducted a criminal record check and stated in his affidavit that defendant disclosed eleven felony convictions. The dates and underlying crimes for these convictions are unknown.

16

want to inquire about possible criminal activity, particularly given defendant's vague responses as to his whereabouts in Massachusetts. The majority cites no authority for its consideration of the fact that a second encounter was involved. Nor does it explain why defendant did not feel free to terminate the questioning during the second encounter but would have felt free to terminate the exact same questioning during the first encounter had the trooper revealed his knowledge of defendant's record at that time. The majority emphasizes that the officer decisively terminated the first encounter and that there was a gap between the first and second encounters. Ante, ¶ 23. Ironically, other courts have held that clear termination of the first encounter and passage of time between encounters are the most important factors in finding that the second encounter is not a seizure—regardless of whether the first encounter is a seizure. See State v. Thompson, 166 P.3d 1015, 1040, 1045 (Kan. 2007) (finding no seizure where defendant was stopped for broken headlight, and officer, after issuing verbal warning and disengaging with defendant, turned and asked defendant he if could ask further questions); Commonwealth v. Strickler, 757 A.2d 884, 900 (Pa. 2000) (finding no seizure where officer, after terminating valid traffic stop during which officer ran warrant check, asked defendant if he had anything illegal in his car and asked for consent to search vehicle); State v. Williams, 646 N.W.2d 834, 841 (Wis. 2002) (finding no seizure where traffic stop ended and defendant was told he could leave but officers turned and began questioning defendant about possession of guns, knives, drugs, and large amounts of money).[10] I doubt anyone who reads this decision will believe that if the trooper had done more research before the first encounter, announced his knowledge of defendant's criminal record at that time, and then asked the same exact questions, the result would be any different.

---

[10] Williams particularly is instructive because of the nature of the officer's questions and the court's holding that these questions did not create a seizure. 646 N.W.2d at 841. Included in the questions were: "There's no guns in the car is there?"; "Any knives?"; "How about any drugs? You guys got any drugs in there?"; and "Any large amounts of money?" Id. at 837.

¶ 32. I also want to emphasize defendant's record. The majority states that the trooper acted upon defendant's "stale arrest record." Ante, ¶ 27. I do not believe that eleven felony offenses is a record the trooper can or should ignore, or that the trooper's knowledge of that record somehow should inhibit him from asking about it. This brings me back to the "pointed questions" factor. In considering this factor, it is difficult to see how the second encounter could involve a seizure and the first could not. During the first encounter, the trooper asked: "What are you doing? You don't have a license. What are you doing driving?" As I discuss below, I am not clear what the definition of "pointed question" is. But it is hard to imagine any definition of a pointed question that would not include the trooper's questions in the first encounter. Embedded in the questioning is an accusation that defendant committed a crime. Indeed, the majority describes the second encounter as beginning "with a specific assertion reflecting an individualized investigation of defendant's background," ante, ¶ 26, which is exactly how the first non-seizure encounter began. I recognize that the majority has not ruled explicitly on whether the first encounter was a seizure. But it has ruled, in part, that the second encounter became a seizure because it was a second encounter, thus raising a comparison between the two encounters. I think the other factors cited by the majority are so weak that, even without comparing the first and second encounters, its decision can be read only as holding that the pointed questions about drugs alone created a seizure. There are two other reasons why this reading is compelled.

¶ 33. A significant part of the majority's rationale is that its holding is supported and controlled by our decision in Pitts, 2009 VT 51. Indeed, the majority's discussion of Pitts, and the cases cited therein, takes up seven full paragraphs in the decision and provides most of the analysis on which its decision is based. Out of thirteen paragraphs of analysis, only parts of two of these paragraphs mention the secondary factors—i.e., those factors other than the pointed questions. The majority introduces the significance of Pitts with the following statement: "While

18

the facts of <u>Pitts</u> might be distinguishable from the instant case, the legal principles enunciated therein are applicable." <u>Ante</u>, ¶ 17. Although the finding of a seizure in <u>Pitts</u> is based on three significant factors, as discussed below, two are ignored in the majority decision, and the only "legal principle" taken from <u>Pitts</u> is that pointed questions create a seizure. The majority's one-dimensional analysis of <u>Pitts</u> is a clear demonstration that it has created a per se rule.

¶ 34. Supporting this view is the majority's heavy reliance on <u>In re J.G.</u>, 726 A.2d 948 (N.J. Super. Ct. App. Div. 1999). That decision creates the per se rule that asking a suspect if there is " 'anything on him that he shouldn't have' . . . automatically convert[s]" a consensual encounter into "a <u>Terry</u> stop detention." <u>Id</u>. at 953[11]; see also <u>State v. Felix</u>, 2010 WL 1424403, at *4 (N.J. Super. Ct. App. Div. Apr. 8, 2010) (citing <u>J.G.</u> for proposition that asking suspect if there is " 'anything on him that he shouldn't have' " automatically "convert[s] field inquiry into a <u>Terry</u> stop"). In <u>State v. Rodriquez</u>, 796 A.2d 857, 863-64 (N.J. 2002), the New Jersey Supreme Court decided a case in which the officer asked the same question but, rather than relying upon the per se rule of <u>J.G.</u>, concluded that there was a seizure based primarily on other factors, essentially aligning its decision with <u>Pitts</u>.

¶ 35. Finally on this point, I simply am reading the majority opinion for what it says. It first states in its holding:

> Both this Court and other courts have held that although "mere questioning" may not constitute a seizure per se, pointed questions about drug possession or other illegal activity in circumstances indicating that the individual is the subject of a particularized investigation may convert a consensual encounter into a <u>Terry</u> stop requiring objective and articulable suspicion under the Fourth Amendment.

---

[11] Ironically, the officer in <u>J.G.</u> never told the juvenile that he was free to terminate the encounter, but, in light of its per se rule, the court never relied on that factor. The court merely stated that "Officer Kelly never told them that they had to stop or that they were not free to leave." 726 A.2d at 950.

Ante, ¶ 16. It later states: "A prior arrest nearly a decade earlier does not continue to render defendant subject to pointed questions about his drug use indefinitely absent some reasonable articulable suspicion justifying the seizure." Ante, ¶ 27. Despite the majority's protestations to the contrary, and in the absence of any recognition of the multiple reasons for the Pitts decision, these are statements reflecting a per se rule. If this is a totality-of-the-circumstances decision, the totality consists of one circumstance—pointed questions.

¶ 36. Having stressed that point, I return to the proper way to view this case under United States Supreme Court precedent and the formulation of the "free to leave" standard for consensual encounters. Starting with Terry v. Ohio, 392 U.S. 1 (1968), the pivotal Supreme Court case that established the "stop and frisk" rule under the Fourth Amendment, the Court noted:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

Id. at 19 n.16.

¶ 37. The Court expanded on this notation more than a decade later in United States v. Mendenhall, 446 U.S. 544 (1980) (plurality). In Mendenhall, the Court held that the defendant was not seized within the meaning of the Fourth Amendment when she was approached for questioning in the airport by a drug enforcement agent, was asked to provide identification, was informed that the agent was a federal narcotics agent, accompanied the agent to a private office, and consented to the search of her person and handbag. Id. at 555-60. The Court observed that "not every encounter between a police officer and a citizen is an intrusion requiring objective justification." Id. at 553 (citing Sibron v. New York, 392 U.S. 40, 63 (1968)). The Court further stressed that its holding "adhere[s] to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." Id. The Court

20

then concluded that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 554 (footnote omitted). Examples of circumstances that might signal to an individual that he or she is not free to leave include the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of [a] person . . ., or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. Thus, it is a totality-of-the-circumstances inquiry into whether a person is seized, with no single factor determinative on its own. Id. at 557.

¶ 38. While the Mendenhall "free to leave" test did not command a majority of the Court (three justices concurred in the judgment but on the ground that the agent had reasonable suspicion to stop the defendant), the test was endorsed by the majority when the issue was revisited a few years later in Florida v. Royer, 460 U.S. 491 (1983). Initially, the facts of Royer played out quite similarly to those of Mendenhall. But when the agents in Royer informed the defendant that they were narcotics investigators, they added that "they had reason to suspect him of transporting narcotics." Id. at 494. Furthermore, the agents failed to return the defendant's identification and airline ticket; they seized and had possession of the defendant's luggage; and they asked the defendant to accompany them to a small, private room where they asked for consent to search his suitcases. As the Court stated,

> [a]sking for and examining [the defendant's] ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told [the defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [the defendant] was effectively seized for the purposes of the Fourth Amendment.

21

Id. at 501. "These circumstances," the Court continued, "surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave' " Id. at 502 (quoting Mendenhall, 446 U.S. at 554). While the fact that the agents told the defendant that they suspected him of transporting narcotics was part of the equation in finding the atmosphere coercive, the Court focused more heavily on the facts that the agents failed to return the defendant's documents, he was taken to a private room, his luggage was seized, and the agents "made no effort to advise [the defendant] that he need not consent to the search." Id. at 503 n.9.

¶ 39.    Importantly, the Royer Court emphasized that it does not "suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop." Id. at 506. As demonstrated by Royer, the nature of the questioning weighs in the balancing of the circumstances, and while incriminating questions add to the scale, it is this factor alongside other coercive acts on the part of the officers that elevate a consensual encounter to a seizure.

¶ 40.    Nearly a decade later, in Florida v. Bostick, the Supreme Court revisited the "free to leave" test in the context of bus sweeps.[12]  In Bostick, officers boarded a bus at a scheduled stop and asked passengers for permission to search their luggage.  The officers eyed the defendant and asked to inspect his ticket and identification.  After returning the defendant's documents, the officers explained that they were narcotics agents on the lookout for illegal drugs. They then requested to search the defendant's luggage.  The Court found two facts worth noting in determining whether the defendant was seized: (1) that the defendant was advised that he had the right to refuse consent to the search and (2) that the officers never threatened the defendant with their weapons.  501 U.S. at 432.

---

[12]    In a lengthy paragraph in Pitts, we summarized the academic criticism of Bostick, although we stated that our reasoning in Pitts is consistent with Bostick.  2009 VT 51, ¶ 17-18.  I take that as a recognition that we were reaching the outer limits of Fourth Amendment seizure jurisprudence and, at least arguably, had exceeded it.

¶ 41.   The defendant in Bostick argued that his case was different from other "free to leave cases" because "it took place in the cramped confines of a bus . . . [where] police tower over a seated passenger and there is little room to move around." Id. at 435.  He further argued that a reasonable bus passenger would not feel free to leave because there is nowhere on the bus to go.  Id.  The Court rejected that argument, reasoning that the defendant's "freedom of movement was restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus." Id. at 436.  As such, the Court concluded that the proper inquiry is not whether a passenger feels free to leave but whether "a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter." Id.  Again, the Court stressed that this holding "breaks no new ground," as it merely applies the same totality-of-the-circumstances inquiry used in other Fourth Amendment seizure cases.  Id. at 436-37.[13]

¶ 42.   Against the backdrop of United States Supreme Court Fourth Amendment jurisprudence, lower federal and state courts consistently have rejected bright-line, per se rules for determining when consensual encounters transform into Fourth Amendment seizures.  See, e.g., United States v. Gilbert, 936 F.2d 377, 378 (8th Cir. 1991) (rejecting "bright-line" rule that seizure occurs when officer identifies himself as narcotics agent and shows badge); Caldwell v. State, 41 So. 3d 188, 200 (Fla. 2010) (rejecting per se rule that seizure occurs when officer gives Miranda warnings); G.M. v. State, 19 So. 3d 973, 979 (Fla. 2009) (rejecting per se rule that seizure occurs when officer activates police lights).  Notably, the Tenth Circuit expressly rejected a per se rule prohibiting questions about illegal activity, stating that, while the fact that a person is the particular focus of an investigation is a factor to be considered in the totality-of-the-circumstances analysis, it should not stand as a rule on its own.  United States v. Glass, 128 F.3d 1398, 1407 (10th Cir. 1997).  With respect to accusatory statements about drug possession, the

---

[13]   The Court ultimately chose not to determine whether a seizure occurred and instead remanded the case to the Florida Supreme Court to assess the totality of the circumstances.  Id. at 437-38, 440.

Tenth Circuit has acknowledged that framing the subject of drugs in the form of a question is "appreciably [less] coercive," but that an accusatory statement by itself does not constitute a seizure where other coercive factors are absent, particularly where it is a single statement and "not part of a series of accusatory remarks" and the statement is "spoken in an ordinary tone of voice." United States v. Jones, 701 F.3d 1300, 1314 (10th Cir. 2012) (quotation omitted); see also United States v. McKines, 933 F.2d 1412, 1417-18 (8th Cir. 1991) (rejecting per se rule that seizure occurs when defendant is made aware he is suspected of drug trafficking).

¶ 43. As such, the courts repeatedly have recognized that the totality-of-the-circumstances standard is appropriate for assessing the nature of an encounter, and while questions about drugs and other illegal activity may be a factor in the calculus, courts largely have found this conduct permissible in the absence of other coercive tactics on the part of law enforcement officers. See, e.g., Jones, 701 F.3d at 1314-15 (finding no seizure where officers followed defendant home, approached him while he sat in his truck, introduced themselves as officers investigating narcotics, and told him they were there for his marijuana plants); United States v. Vera, 457 F.3d 831, 836 (8th Cir. 2006) (finding no seizure where officers approached vehicle parked at rest stop, asked defendant if he would mind stepping out of vehicle and entering patrol car, and asked him in patrol car if he had any drugs, weapons, or large amounts of money in his possession); United States v. Ringold, 335 F.3d 1168, 1172-74 (10th Cir. 2003) (finding no seizure where officer approached defendant at gas station, asked defendant questions about his destination, told defendant that he often received reports of drugs or weapons being transported in area, and asked defendant if he had anything like that in his possession); United States v. Hooper, 935 F.2d 484, 492 (2d Cir. 1991) (finding no seizure where federal narcotics agents approached defendant at airport, informed defendant they were concerned with narcotics coming through airport, and asked defendant for consent to search suitcase); United States v. Wilson, 895 F.2d 168, 170 (4th Cir. 1990) (finding no seizure where federal narcotics agents

24

stopped defendant in airport, informed defendant that they were investigating drug trafficking, and asked if he had anything illegal in his possession); Kelly v. United States, 580 A.2d 1282, 1288 (D.C. 1990) (finding no seizure where narcotics agent approached defendant as he exited train, told defendant he was investigating drugs, and asked for consent to search defendant's bags); Caldwell, 41 So. 3d at 202-03 (finding no seizure where officers approached defendant, told him they had seen video of break-in at nearby apartment building and knew that he was involved, and read defendant his Miranda rights even though he was not under arrest); State v. Thomas, 343 S.E.2d 588, 592 (N.C. Ct. App. 1986) (finding no seizure where narcotics agents approached defendant in airport, informed him that they were investigating drug trafficking, asked him to accompany them to private office, and asked defendant in office if he was carrying drugs); State v. Jones, 678 N.E.2d 285, 288 (Ohio Ct. App. 1996) (finding no seizure where narcotics agent approached defendant in airport, informed him that they were investigating drug trafficking, and asked defendant if he had anything on him); Hunter v. State, 955 S.W.2d 102, 104-05 (Tex. Crim. App. 1997) (finding no seizure where federal narcotics agent identified himself as such and asked defendant if he was carrying narcotics); Branham v. Commonwealth, 720 S.E.2d 74, 78 (Va. 2012) (finding no seizure where officers approached defendant while sitting in parked car in driveway, asked for identification, and asked if he had anything illegal in vehicle).

¶ 44.    It is our reliance on the totality of the circumstances in Pitts that differentiates that case from the majority's analysis here.  In Pitts, two police officers first encountered the defendant at a "drug house" while serving a subpoena on an individual in connection with a major drug-distribution case.  The officers had information that the individual had sold drugs together with a Hispanic male from New York.  The defendant, who fit that description, was in the apartment when the subpoena was served and appeared nervous when the officers were present.  The officers waited outside the apartment and observed the defendant enter a taxi.  They

25

followed in their vehicle and learned from the taxi company that the defendant made the same taxi run to the same address several times a day. The officers approached the defendant as he exited the taxi. One officer asked the taxi driver if he could search the vehicle. The other officer asked to speak to the defendant, who consented. The officer asked the defendant if he had any weapons, and the defendant produced a pocket knife. The officer then patted the defendant down and found a large wad of cash. At the same time, the questions "progressed to inquiries indicating a particularized suspicion of criminal activity." Pitts, 2009 VT 51, ¶ 15. We found a seizure based on the officers' obvious following of the defendant for a substantial distance, a surveillance of which the defendant "plainly would have been aware"; the officers' request to search the taxi in which the defendant was riding; and the successive questioning about weapons and drugs. Id. ¶ 16. All three factors are controlling components of the Pitts holding.

¶ 45. Further, Pitts holds that the pointed questions about drugs must arise "in circumstances indicating that the individual is the subject of a particularized investigation." Id. ¶ 9 (emphasis added). This language is a restatement of the totality-of-the-circumstances test. The drug questions alone are not sufficient to create a seizure, but when those questions are of such a nature or occur in such a manner that a reasonable person would feel he is the subject of an investigation and not free to leave or terminate the encounter, then the Fourth Amendment is implicated. As I discussed above, the other primary factor cited by the majority is that the trooper returned for a second time to reinitiate contact. I repeat that I find it difficult to understand why defendant would be less likely to terminate the questioning or refuse to answer the questions merely because they arise in a second encounter. Of course, it was possible for the trooper to conduct a more thorough investigation and find defendant's criminal record prior to the first encounter, but I think it is highly unlikely that the majority's opinion would be any different if the trooper had asked the same questions during the first encounter.

¶ 46.    The majority's almost exclusive focus on a single factor—the pointed questions—is what also distinguishes this case from all but one of the cases the majority cites in support of its analysis.  Not only do I disagree that these out-of-state cases are analogous here, but I also fail to see how they stand for the broad principle that "pointed questions" about drugs automatically convert a consensual encounter into a Fourth Amendment seizure.  I place the following cases in this category.  In State v. Alverez, 2006 UT 61, 147 P.3d 425, the narcotics officers approached the defendant and told him that they suspected him of transporting drugs.  The court held that a seizure occurred because the questions "originated from a pair of uniformed police officers who waited for and then surprised [the defendant] alone in a residential parking lot" and the "accusatory nature of the questions and the context in which they were asked demonstrated a 'show of authority' sufficient to restrain [the defendant's] freedom of movement."  Id. ¶ 12 (emphasis added) (quoting Mendenhall, 446 U.S. at 553).  In State v. Contreras, 742 A.2d 154 (N.J. Super. Ct. App. Div. 1999), the officers asked the defendants to exit their train "without any question about or regard for defendants' final destination"; informed the defendants that there were "problems" with drugs, weapons, and other contraband being transported in the area; asked the defendants if they had anything like that in their possession; and then asked the defendants to accompany them to the police complex to be searched.  Id. at 160.  It was the coercive tactics on the part of the officers that moved the court to find a seizure.  Id. at 160-61.  In Parker v. Commonwealth, 496 S.E.2d 47 (Va. 1998), the court found the facts that the officer, while in uniform, followed the defendant and displayed his weapon during the encounter to be important considerations in concluding that a seizure had occurred.  Id. at 51.  And in State v. Jason L., 2000-NMSC-018, 2 P.3d 856, officers approached two juveniles walking down the street late at night, began to follow them in the police cruiser, eventually ordered them to come over to the cruiser, and then asked the boys if they were armed.  The court addressed the nature of the questioning but also emphasized that the two juveniles were being followed late at night

27

on an empty street by more than one armed officer; the boys knew they were being followed; the officers gave orders to the boys to approach the cruiser; and they spoke in an aggressive and authoritative tone. Id. ¶ 17. The court also found the age of the boys significant. Id. ¶ 18.

¶ 47. One case cited in Pitts appears to adopt a per se rule against certain questions. In United States v. Nunley, 873 F.2d 182 (8th Cir. 1989), the court held that the defendant was seized when a federal narcotics agent approached her in an airport for questioning and, in response to her inquiry as to why she was being questioned, informed her that he was "there to stop the flow of drugs through the airport." Id. at 184. A mere two years after Nunley was decided, however, the Eight Circuit expressly rejected the notion of a per se rule in McKines and declined to follow several earlier cases that purported to establish such a rule. 933 F.2d at 1417-18. The court stated:

> [N]ot that the facts of flashing a badge and making a suspect aware that he is suspected of drug trafficking are themselves irrelevant in determining the occurrence of a [F]ourth [A]mendment seizure, but . . . insofar as [our prior cases] purport to establish a bright line rule that seizure occurs when an officer identifies himself as a drug enforcement agent and flashes his badge a second time, . . . [they] should not be followed.

Id.

¶ 48. The one case that is close to this one and is heavily relied upon by the majority is In re J.G., 726 A.2d 948. J.G. holds that asking a juvenile if he has "anything on him that he shouldn't have" automatically creates a seizure, irrespective of any other factor. Id. at 953. In Felix, the New Jersey appellate court went incrementally further by holding that asking any person whether he has anything illegal on him creates a seizure. 2010 WL 1424403, at *4. Except for decisions from intermediate appellate courts in New Jersey, this holding has been relied upon in only one other decision—Pitts. Again, J.G., a case involving a juvenile,[14] is the

---

[14] Age is a significant factor in determining whether a seizure has occurred in a case involving a juvenile. See, e.g., In re Jermaine, 582 A.2d 1058, 1063-64 (Pa. Super. Ct. 1990)

only other state or federal court decision that supports the majority's holding here.  In my opinion, it clearly is an outlier that should not be followed beyond its usage as a factor in <u>Pitts</u>.  I have three main reasons for this view.[15]

¶ 49.   First, <u>J.G.</u> clearly is inconsistent with the direction from the United States Supreme Court that the decision of whether a seizure has occurred must be made based on the totality of the circumstances and not one factor.  <u>J.G.</u> announces a per se rule based on one factor.

¶ 50.   Second, <u>J.G.</u> is based on the characterization of the question involved as "unduly authoritative, indicative of criminal suspicion, and harassing," 726 A.2d at 953, "presuppos[es] criminal activity," <u>id</u>., and "implie[s] that [the defendant] was or might be involved in criminal conduct," <u>id.</u> at 954.   These characterizations apparently were made to meet the standard that "a field inquiry becomes a <u>Terry</u> stop upon unsupported outright accusations of criminal activity." <u>Id</u>. at 953.   While the officer certainly asked the defendant if he was engaged in conduct that might be criminal, the characterization of the question is wildly exaggerated.   The question

---

(stating that "age is one element to acknowledge in ascertaining whether consent [to search] was given willingly" (quotation omitted)).  We recently discussed a juvenile's age in the context of a custody analysis in <u>In re E.W.</u>, 2015 VT 7, ___ Vt. ___, 114 A.3d 112.  There, we stated that " 'a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.' "  <u>Id</u>. ¶ 18 (quoting <u>J.D.B. v. North Carolina</u>, ___ U.S. ___, 131 S. Ct. 2394, 2403 (2011)).  We further emphasized that "[t]his is not to say that a [juvenile] may never feel free to terminate a police interview, but only that we must be particularly vigilant to ensure that <u>other</u> factors support that conclusion."  <u>Id</u>.

[15]  I also note that each of the precedents on which the court relied in <u>J.G.</u>  in fashioning its rule has been abrogated, overturned on rehearing, or otherwise fails to stand for the proposition the court asserts.  See <u>United States v. Gilbert</u>, 936 F.2d 377, 378 (8th Cir. 1991) (recognizing abrogation of <u>United States v. Millan</u>, 912 F.2d 1014 (8th Cir. 1990), on ground that no bright-line rule exists for determining Fourth Amendment seizure); <u>United States v. Berryman</u>, 717 F.2d 650, 650-51 (1st Cir. 1983) (per curiam) (concluding on rehearing en banc that defendant was not seized and adopting reasoning of dissent from <u>United States v. Berryman</u>, 717 F.2d 651 (1st Cir. 1983), the earlier panel decision); <u>United States v. Berry</u>, 670 F.2d 583, 597, 602-04 (5th Cir. 1982) (stating that courts must assess totality of circumstances in determining whether Fourth Amendment seizure occurred and considering fact that federal narcotics agents escorted defendants to private office to be paramount).

neither presupposed criminal conduct nor implied that the officer believed that the defendant was engaged in criminal conduct. I cannot find a question asked in a "conversational tone" to be "unduly authoritative". Id. at 950. The court does not explain how the mere asking of a question is harassment. Most important, the question contained no "outright accusations" of criminal conduct. I discuss this aspect of the majority's decision relying on J.G. in more detail infra, ¶¶ 55-56.

¶ 51.    Third, it is quite apparent that J.G. is warring with Bostick. Indeed, the court adopts as an alternative holding that the request for consent to search the defendant's backpack was itself a seizure. Id. at 954. The court held that "by focusing in on [the defendant's] backpack, [the officer] implied that [the defendant] was or might be involved in criminal conduct and such focus supports the notion that the juvenile was under investigation and not free to leave." Id. I have itemized most of the facts of Bostick above, supra, ¶¶ 40-41. The key facts were that the officers entered the bus, surveyed the passengers, approached the defendant, told the defendant that they were narcotics agents on the lookout for drugs, and asked the defendant for consent to search his luggage. Bostick, 501 U.S. at 431-32. Just like the officers in J.G., the officers in Bostick focused on the defendant's luggage. If that conduct was an implication of criminal conduct in J.G., it was even more of an implication in Bostick. In fact, if merely asking whether a defendant has contraband creates a seizure in J.G., it is totally inconsistent to hold that a request to consent to search for contraband by drug agents is not a seizure.

¶ 52.    The real war with Bostick is with the Supreme Court's explanation that an officer without reasonable suspicion may approach individuals "and ask them potentially incriminating questions." 501 U.S. at 439. As decisions from federal courts following Bostick make clear, the question involved in J.G. is the type of "potentially incriminating question" approved of in Bostick. See United States v. Tapia, 309 F.3d 1283, 1285 (10th Cir. 2002) (officer asked if defendant's "luggage contained any weapons, drugs or explosives"); United States v.

30

Broomfield, 201 F.3d 1270, 1272, 1275 (10th Cir. 2000) (officer asked defendant "if he had any guns or drugs in [his] bag"); United States v. Kim, 27 F.3d 947, 950, 953 (3d Cir. 1994) (officer asked, "You guys don't have drugs in your luggage today, do you?"); United States v. Mason, 550 F. Supp. 2d 309, 314, 317 (E.D.N.Y. 2008) (officer asked defendant "if he had anything on him that might hurt [the officer or his] partner" (quotation omitted)); see also Stith v. Commonwealth, No. 2394-03-2, 2005 WL 41529, at *4 (Va. Ct. App. Jan. 11, 2005) (officer asked defendant "if he had any outstanding warrants" (quotation omitted)).[16] In my opinion, the holding of J.G. cannot be made consistent with Bostick.

¶ 53.    In summary, the "legal principles enunciated" in Pitts certainly do not support the single-factor analysis adopted by the majority. If they did, they would be inconsistent with controlling Fourth Amendment jurisprudence as enunciated by the United States Supreme Court and supported by the vast weight of lower federal and state court decisions. The cases cited in Pitts certainly do not command the majority's result here. This is the first and most important ground for this dissent.

¶ 54.    The second ground for this dissent involves the majority's holding that "pointed questions" turn a lawful encounter into a seizure. The majority does not define pointed questions, and the term has no obvious meaning. Although the term originated in Pitts, the actual questions the officers asked in that case are not included in the decision, and the term is not used in any of the decisions cited in Pitts or in the majority opinion. The only way to determine what the majority considers a pointed question is by looking at the questions it has labeled as such. Apparently, there are three offending questions here: (1) "Are you still involved in the drug trade?"; (2) "Do you have anything that you're not supposed to have on you?"; and

---

[16]    In a pre-Bostick case, the Arizona Supreme Court held that a question identical to that in J.G. did not prevent a subsequent consent to search from being consensual and voluntary. State v. Tigue, 386 P.2d 402, 405 (Ariz. 1963), overruled on other grounds by State v. Harvill, 476 P.2d 841, 846 (Ariz. 1970).

(3) "Do you have anything in the car you shouldn't possess?" The only additional information the trooper conveyed was that he knew defendant had formerly been arrested for drug offenses; this was the context for the first question. Of course, we also know that defendant later disclosed that he had been convicted of eleven felony offenses, a fact that the trooper presumably knew from checking defendant's criminal history.

¶ 55. As I point out in my above discussion of J.G., however one labels the trooper's questions, none of them accuses defendant of a crime or conveys the impression that the trooper believes or suspects that defendant has committed a crime. None of them suggests that the trooper has more information about defendant than he had volunteered to him. Only one question is explicitly about drugs. None of the questions suggests that defendant is not free to refuse to answer or that the officer would do anything to him if he refused. The court provided the correct analysis in Kim when it considered the officer's question about whether defendant had drugs in his luggage. The court stated: "[W]e do not believe this question was accusational. The tone of the question in no way implied that [the officer] accused or believed that [the defendant] had drugs in his possession; it was merely an inquiry." 27 F.3d at 953.

¶ 56. I understand from the majority's decision that it has a different view of the questions, but it is difficult to tease out of the decision the characteristics of the questions the majority finds objectionable. It faults the trooper for conducting a drug investigation, ante, ¶ 23, but the motive of the trooper is irrelevant to whether defendant objectively would believe he could not terminate the encounter.[17] The majority reasons that "[t]he officer's individualized focus on this particular defendant" is significant, ante, ¶ 24, but this description applies whenever an officer is questioning a person about that person's conduct or intentions—and certainly

_____

[17] Shortly after the questions at issue, the trooper asked defendant whether he would consent to a search, and defendant refused, showing he knew of his right to refuse. He consented only after the trooper told him he was seizing the car. Moreover, one would expect that a person convicted of eleven felonies would know his rights. I have not included either of these factors in my analysis.

32

applied to the first encounter. The majority calls one of the questions " 'unduly authoritative, indicative of criminal suspicion, and harassing.' " Ante, ¶ 27 (quoting J.G., 726 A.2d at 953). My difficulty with this greatly overstated criticism in J.G. is discussed earlier. Asking a person whether he is engaging in criminal conduct neither connotes suspicion nor improperly harasses the person to whom a question is posed. The whole point of any question asked by a law enforcement officer is whether criminal conduct is occurring or has occurred. Accepting this description would stop all police questioning without reasonable suspicion, exactly contrary to controlling United States Supreme Court precedent.

¶ 57. I recognize that there are decisions from other jurisdictions that hold that the form of the questions about possible illegal activity may be a factor in determining that a seizure had occurred, particularly if asked in an aggressive or intimidating manner. As Professor LaFave observes, a consensual encounter may become a seizure when "the officer engages in conduct a reasonable person would view as threatening or offensive even if performed by another private citizen." W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a), at 585-86 (5th ed. 2012). Where a seizure turns on the nature of the officer's questioning, the questions invariably are accusatory or are accompanied by statements that make them accusatory or express the officer's suspicion that the individual being questioned has committed a crime.

¶ 58. This essential difference is illustrated in two California cases. In Wilson v. Super. Ct., 670 P.2d 325 (Cal. 1983), the California Supreme Court found a seizure where a narcotics agent approached the defendant at the airport, showed the defendant his badge, and told him that he was conducting a narcotics investigation and that the he had information that the defendant would be arriving with a lot of drugs. Id. 334-35. The agent then asked for permission to search the defendant's luggage. The court held that a seizure occurred when the agent stated that he expected the defendant would be arriving with drugs because the defendant would realize at that point that "he was the focus of the officer's particularized suspicion." Id. at 334.

¶ 59.    In a later case, <u>People v. Profit</u>, 229 Cal. Rptr. 148 (Ct. App. 1986), the California Court of Appeal did not find a seizure under similar facts but where the nature of the questioning was different from that in <u>Wilson</u>.  <u>Id</u>. at 155-56, 166-67.  In <u>Profit</u>, a narcotics agent also encountered the defendants at the airport but, on this occasion, merely asked the defendants if they were carrying any drugs in their luggage.  The defendants said no and gave the agent consent to search a briefcase.  The court expressly distinguished <u>Wilson</u> in concluding that no seizure had occurred because the agent "made no statement that he had information that the defendants were carrying drugs."  <u>Id</u>. at 156.  In view of the analysis in the California decisions, it is no surprise that the one out-of-state case that considers <u>Pitts</u> is from California, and that case rejects its holding with respect to pointed questions.  See <u>People v. Sanchez</u>, No. E058674, 2014 WL 7366681, at *7 (Cal. Ct. App. Dec. 26, 2014).  As discussed above, however, even accusatory questions do not necessarily create a Fourth Amendment seizure on their own, and other courts have found such questions permissible under different circumstances.  See, e.g., <u>Jones</u>, 701 F.3d at 1314; <u>Glass</u>, 128 F.3d at 1407; <u>Gilbert</u>, 936 F.2d at 378; <u>Caldwell</u>, 41 So. 3d at 202-03; <u>G.M.</u>, 19 So. 3d at 979.

¶ 60.    Although references to pointed questions occur occasionally in decisions from other jurisdictions, no jurisdiction has fashioned a per se rule that pointed questions alone transform a consensual encounter into a seizure.  As such, no decision supports the majority's per se seizure rule.  One jurisdiction, New York, has incorporated the concept of pointed questions into its state constitutional search and seizure law and explicitly has held that pointed questions do not create a Fourth Amendment seizure.  The critical decision is <u>People v. Hollman</u>, 590 N.E.2d 204 (N.Y. 1992), in which the New York Court of Appeals established four levels of police/citizen interaction for the purposes of search and seizure regulation.  In doing so, it rejected the Fourth Amendment line between a seizure and a non-seizure.  Instead, the court created two categories within the federal category of non-seizures.  The first category involves

encounters where the officer asks the citizen for basic identifying information, including destination and the reason for being in the area. Id. at 209. The second category involves "more pointed questions"[18] indicating that the officer is investigating criminal activity. Id. at 206, 209-10; see also People v. Faines, 747 N.Y.S.2d 484, 487 (App. Div. 2002) (stating that officer cannot ask "pointed questions" in first-category encounter). While the first category requires no grounds to believe criminal activity has occurred, the second "must be supported by founded suspicion that criminality is afoot." Hollman, 590 N.E.2d at 210.

¶ 61. The New York Court of Appeals created these categories based on state common and constitutional law—not on the Fourth Amendment—and explicitly held that encounters in the first and second categories are not Fourth Amendment seizures. Id. at 212. Indeed their purpose is "to [not] eliminate entirely [the courts'] oversight of police encounters that fall below the level of a Fourth Amendment seizure." Id. One federal court decision applying New York law appropriately noted that the New York decisions are more concerned about the substance of the officer's questions while the Fourth Amendment is more concerned about the manner of the questioning—e.g., whether it is aggressive, accusatory, or otherwise coercive. See Davis v. City of New York, 959 F. Supp. 2d 324, 342 n.75 (S.D.N.Y. 2013). I emphasize, however, that Hollman is a holding that "more pointed questions" do not create a Fourth Amendment seizure.

¶ 62. In summary, my second reason for this dissent is that the asking of "pointed questions" alone is not an appropriate standard for determining whether an encounter is a seizure. The standard is vague and clearly does not fit the questions that are involved in this case. The standard has not been used by any other jurisdiction and has not been adopted by the United States Supreme Court. New York—the one jurisdiction to use "pointed questions"—does

---

[18] The court defines "pointed questions" merely by what they are not. Essentially, anything other than questions asking for basic identifying information, whereabouts, and reason for being in the area are considered "more pointed questions" under New York law. Such a broad definition clearly is unworkable in the Fourth Amendment context.

not use the term to determine whether a Fourth Amendment seizure exists and recognizes such use as overbroad.

¶ 63.    Returning to this case, we must look at the factors that show there was no seizure—facts the majority has ignored. There is no question that the first encounter was congenial. The trooper maintained a conversational tone, chatted and laughed with defendant, and merely cautioned defendant not to drive rather than issue him a citation. When the trooper returned a second time, a reasonable person would not feel that, after the congenial nature of the first encounter, the interaction had suddenly become authoritative and coercive.

¶ 64.    Although the second encounter began with a statement about defendant's history of drug offenses and inquiries about whether he was still involved in that trade or had anything illegal in his possession, the congenial tone of the officer's voice did not change. He tapped politely on defendant's window, never commanded that he open the window, and apologized for waking defendant a second time. Although a second trooper was on the scene, this trooper did not interact with defendant but stood on the opposite side of the vehicle a small distance away. Neither trooper parked near or blocked defendant's car, no lights were activated, and although the troopers wore uniforms, neither explicitly showed defendant his badge or brandished a weapon. The trooper never accused defendant of possessing drugs; he merely inquired about it. Given the weight of these circumstances—circumstances that are significantly less coercive than those in many of the above-cited cases where courts have found no seizure—I must conclude that no seizure occurred here until the trooper gained the requisite reasonable suspicion from defendant's voluntary responses to the trooper's questions.

¶ 65.    I conclude that the encounter was consensual at least until defendant disclosed his use of Suboxone and the presence of needles. From there, the trooper had gathered enough information to form the basis of his reasonable suspicion, specifically that: defendant had a prior record of criminal drug offenses; evaded the trooper's questions about his whereabouts in

36

Massachusetts and did not provide cogent responses; hesitated and avoided eye contact with the trooper when asked if he had any contraband in his possession; disclosed that he was in possession of hypodermic needles and provided no explanation for their presence; and stated that he uses Suboxone, which typically is not injected.

¶ 66.    Because none of these factors explicitly involve or individually suggest criminal activity, it is necessary, as I have emphasized in my discussion above, to consider them together. State v. Dunham, 2013 VT 15, ¶ 8, 193 Vt. 378, 67 A.3d 275 (stating that in determining whether officer had reasonable suspicion to effectuate seizure or extend investigative detention, we look at the totality of the circumstances); United States v. Arvizu, 534 U.S. 266, 273-75 (2002) (considering totality of the circumstances and emphasizing that courts must avoid "divide-and-conquer analysis" that scrutinizes each factor independently and accords no weight to conduct that alone is fairly innocuous); United States v. Sokolow, 490 U.S. 1, 9 (1989) (stating that each factor in analysis alone may be consistent with innocent behavior, but factors taken together can form basis for reasonable suspicion).

¶ 67.    Other courts have relied upon these or similar factors, taken together or with other factors, to show reasonable suspicion.  See United State v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) (together with other factors "criminal history contributes powerfully to the reasonable suspicion calculus"); United States v. Riley, 684 F.3d 758, 764 (8th Cir. 2012) (vague, inconsistent, or dubious travel plans may give rise to reasonable suspicion); United States v. Karam, 496 F.3d 1157 (10th Cir. 2007) ("Confusion about details is often an indication that a story is being fabricated on the spot, and vague and evasive answers may be considered, in conjunction with other factors, as contributing to an officer's determination of reasonable suspicion." (quotation omitted)); cf. Commonwealth v. Landry, 779 N.E.2d 638, 641-42 (Mass. 2002) (possession of hypodermic needles may be factor in showing probable cause in certain

circumstances).[19] Although no single factor is determinative on its own, together they present more than "an inchoate and unparticularized suspicion or hunch." State v. Sullivan, 2013 VT 71, ¶ 18, 194 Vt. 361, 80 A.3d 67 (quotation omitted).

¶ 68. Finally, even if I supported the majority's decision on the motion to suppress, I could not support the mandate in light of defendant's waiver of any challenge to the voluntariness of his consent to search. I question whether the evidence here—all of which was found after defendant consented to the search of his person and vehicle—is inadmissible, even given the majority's conclusion that defendant was illegally seized. Fundamentally, this case presents two issues, only one of which defendant preserved for appeal. The first issue is the validity of the seizure, and the second issue is the voluntariness of defendant's consent to search. Defendant raised the first issue in his pretrial motion to suppress, but he waived the right to appeal the voluntariness of his consent by failing to preserve it for appeal in his conditional plea agreement.[20]

---

[19] I recognize that the Massachusetts Court went on to explain that an important factor in this calculus is whether the individual presents the officer with a "facially valid" membership card from a needle-exchange program. Landry, 779 N.E.2d at 642. It held that when provided with evidence of lawful possession of hypodermic needles, an officer has no probable cause of a crime being committed. Id. In this case, defendant did not claim membership in a needle exchange program until after the seizure and even then had no documentation of membership in a program.

[20] Pursuant to Vermont Rule of Criminal Procedure 11(a)(2), defendant signed a conditional plea agreement reserving the right to appeal an adverse ruling on his motion to suppress. V.R.Cr.P. 11(a)(2) (providing that defendant may "reserve[e] in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion"); see also State v. Peterson, 2007 VT 24, ¶ 9, 181 Vt. 436, 923 A.2d 585 (stating that appeal based on conditional plea is "limited to review of the decision on the motion specified in the plea agreement"); State v. Fletcher, 2010 VT 27, ¶ 16, 187 Vt. 632, 996 A.2d 213 (mem.) ("All non-jurisdictional issues not specifically preserved in the conditional plea agreement are waived." (quoting United States v. Kingcade, 562 F.3d 794, 797 (7th Cir. 2009))).

Defendant acknowledges that he never contested the voluntariness of the search, but he nonetheless argues that this Court still can independently review the consent issue for plain error. We rejected that same argument in Peterson, stating that, while plain error allows review of issues not raised below, V.R.Cr.P. 52 ("Plain errors or defects affecting substantial rights may be

¶ 69.    The admissibility of the evidence in this case turns not just on the legality of the seizure but also on the voluntariness of the consent.  The majority holds that the seizure was illegal but summarily disposes of the consent issue by stating: "Because defendant was illegally seized, his subsequent 'consents' to the search of his person and car, which occurred very shortly thereafter, were 'tainted and ineffective.' "  Ante, ¶ 27 (quoting State v. Sprague, 2003 VT 20, ¶ 31, 175 Vt. 123, 824 A.2d 539).  The majority's conclusion with respect to this issue glosses over the complexity inherent in determining whether a defendant's consent is voluntary and suggests that the illegality of the prior police action alone taints the consent.  As we stated in Sprague, evidence obtained by way of a valid consent following an illegal detention may sometimes be admissible where the causal nexus between the original illegality and the consent is sufficiently attenuated.  Sprague, 2003 VT 20, ¶ 31.  Because of defendant's waiver, we must presume here that a valid consent was given.

¶ 70.    In State v. Phillips, 140 Vt. 210, 436 A.2d 746 (1981), we held that the applicable test is whether consent was obtained through an exploitation of a prior illegality, but emphasized

---

noticed although they were not brought to the attention of the court."), the doctrine cannot be invoked to overcome defendant's failure to preserve issues in a conditional plea agreement, Peterson, 2007 VT 24, ¶ 10; see also State v. Fletcher, 2010 VT 27, ¶¶ 16-17, 187 Vt. 632, 996 A.2d 213 (mem.) (explaining that issues reserved in conditional plea agreement must be "framed with precision and stated with specificity," and rejecting defendant's attempt to raise new issue regarding legality of stop on appeal (quotation omitted)); United States v. Anderson, 374 F.3d 955, 957-58 (10th Cir. 2004) (rejecting defendant's attempt to contest for first time on appeal voluntariness of his consent to search two trailers on his property, based on allegedly improper patdown search, even though defendant preserved right to appeal denial of his motion to suppress evidence, because defendant failed to make this argument in his motion and it was not addressed by lower court).

As Anderson makes clear, even though the voluntariness of defendant's consent falls under the umbrella of the admissibility of the evidence here, the fact that he did not make the argument in his motion to suppress, and the fact that the trial court never made any findings or conclusions on voluntariness, the issue has been waived and cannot be addressed on appeal.  374 F.3d at 957-58; see also People v. Cooper, No. 183025, 1996 WL 33364275, at *1 (Mich. Ct. App. May 24, 1996) (holding that defendant did not preserve for appeal in his conditional plea agreement issue of "knock and talk" procedure used by officer to obtain wife's consent to search barn, even though issue is related to his motion to suppress, because he did not make argument in his pretrial motion and trial court did not consider argument).

39

that "the connection between an illegal arrest and the discovery of challenged evidence may become sufficiently 'attenuated' to make the evidence admissible when it results from investigation which can be considered as independent of the illegality." Id. at 218, 436 A.2d at 751 (quoting Wong Sun v. United States, 371 U.S. 471, 487 (1963)). This is not a "but for" test. Id. at 488 (noting that defendant's illegal detention at scene of search alone is insufficient basis for invalidating search). There certainly are additional circumstances to consider here beyond defendant's detention at the scene. Defendant was ordered out of the vehicle only after he grabbed the knife on the front seat his car. Although the validity of the exit order was not at issue here, it is certainly conceivable, if not likely, that the trooper's order for defendant to exit the vehicle was permissible—in light of the presence of the knife—to protect officer safety. See Sprague, 2003 VT 20, ¶ 20 (exit order justified to protect officer safety). And it was only after this exit order that the searches occurred. Some question exists regarding the causal nexus between defendant's seizure and his consent to search, a question that involves, at least in part, some factfinding by the trial court. See Chase v. Bowen, 2008 VT 12, ¶ 15, 183 Vt. 187, 945 A.2d 901 (noting that it is not role of appellate court to weigh evidence or find facts). I would remand to the trial court for a determination of the proper mandate.

¶ 71.   In summary, my main position is that I would affirm the trial court's decision that the trooper had reasonable suspicion of criminal activity based on the factors itemized above and that the necessary information was assembled before the encounter escalated into a seizure. I would not adopt a per se rule that "pointed questions" create a seizure and dissent from the majority's adoption of such a rule. I would not join the mandate even if I agreed with the majority's position that there was a seizure before reasonable suspicion was present because defendant waived his right to appeal the voluntariness of his consent to search.

¶ 72.   I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice

40